Renee BETTIS, Plaintiff,

v.

TOYS "R" US, Defendant.

Sonya Gossard, Plaintiff,

v.

JP Morgan Chase & Co., Defendant.

Ramon Sabatier, Plaintiff,

v.

SunTrust Bank, Defendant.

Laisner Paul, Plaintiff,

v.

D & B Tile of Hialeah, Inc., Defendant.

Nos. 06–80334–CIV, 08–60565–CIV, 06–20418–CIV, 09–60259–CIV.

United States District Court,
S.D. Florida.

Aug. 5, 2009.

Loring Noel Spolter, Loring N. Spolter PA, Fort Lauderdale, FL, for Plaintiffs.

Anthony Pogorzelski, Wendy A. Jacobus, U.S. Attorney's Office, Christine Lynne Wilson, Pedro Jaime Torres-Diaz, Jackson Lewis LLP, Miami, FL, Dawn Elizabeth Siler-Nixon, Kelly Hagan Chanfrau, Ford & Harrison LLP, Tampa, FL, Jeffrey Elliot Mandel, David Andrew Young, Fisher & Phillips, LLP, Orlando, FL, for Defendant.

## *ORDER*

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon the Report and Recommendation (DE 205) filed by United States Magistrate Judge Robin S. Rosenbaum. Plaintiffs have filed objections (DE 217) to the Report and Recommendation.[1] The Court has conducted a *de novo* review of the entire record of each of the above-styled causes and is otherwise fully advised in the premises.

A brief procedural history is helpful, if not necessary, to understand why the Court is adopting Magistrate Judge Rosenbaum's Report and overruling Plaintiffs' objections to it. A complete thirty-page procedural and factual history of

these cases is set forth in the Report (DE 205), and this brief background is only offered to frame the supplemental comments provided here and to aid any reviewing court in understanding those points.

Plaintiff Ramon Sabatier filed suit against his former employer SunTrust Bank, alleging that it retaliated against him for making a claim under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* At the summary judgment stage, in that case, the Court found that no genuine issues of material fact remained for the jury to decide and entered judgment for SunTrust. While Defendant SunTrust Bank's Motion For Summary Judgment was pending, Plaintiff filed a Motion To Recuse. Case No. 06–20418–CIV–ZLOCH, (DE 59). In it, he claimed that because the Court had handed down some rulings adverse to the Plaintiff in *Bettis v. Toys "R" Us,* who was represented by the same attorney, the Court was prejudiced against that attorney, Mr. Loring Spolter, Esq., and all of his clients. The alleged root of this illicit prejudice was the undersigned's "extreme religious and political beliefs," about which Mr. Spolter conjectured greatly. *Id.* p. 1. For 110 pages of court filings, Mr. Spolter set out how being Catholic, having law clerks educated at a Catholic law school, and being associated with the Federalist Society led to the conclusion that I hold personal animus against Renee Bettis and her attorney. The Court denied the Motion To Recuse as baseless, and the case was appealed. The Eleventh Circuit affirmed the granting of summary judgment and rejected Sabatier's argument that the undersigned should recuse.

---

1. An identical Objection has been filed in each of the above-styled causes. *Renee Bettis v. Toys "R" Us, Inc.,* Case No. 06–80334–CIV–ZLOCH (DE 217); *Gossard v. JP Morgan Chase & Co.,* Case No. 08–60565–CIV–ZLOCH (DE 109); *Sabatier v. SunTrust Bank,* Case No. 06–20418–CIV–ZLOCH (DE 118);

*Paul v. D & B Tile of Hialeah, Inc.,* Case No. 09–60259–CIV–ZLOCH (DE 41). For the sake of clarity, and unless otherwise noted, the Filings referred to herein will correspond with docket entries in *Renee Bettis v. Toys "R" Us, Inc.,* Case No. 06–80334–CIV–ZLOCH.

*Sabatier v. SunTrust Bank,* 301 Fed.Appx. 913 (11th Cir.2008); Case No. 06–20418–CIV–ZLOCH, DE 80 (Opinion of the Eleventh Circuit). It stated: "We also see no abuse of discretion in the district court's decision to deny Sabatier's motion to recuse." *Id.* p. 915.

In a separate case, Renee Bettis sued her former employer Toys "R" Us for employment discrimination; that case has proven to be the true epicenter of Mr. Spolter's spate of scurrilous allegations and rampant conjecture. After Bettis, through her Counsel, repeatedly failed to comply with the Court's Orders and made affirmative misrepresentations in her filings, the Court dismissed her suit, without prejudice. DE 122 (Final Order of Dismissal); DE 119 (Order denying extension of time because Plaintiff made affirmative misrepresentations in her Motion); DE 115, Ex. A (Plaintiff's misrepresentations). On appeal she challenged the sanction of dismissal and also raised the issue of the undersigned's recusal from her case, citing again, my Catholic faith, some of my law clerks' education, and my connections to the Federalist Society. Notably, the appeal looked past the fact that her attorney willfully failed to comply with the Court's Orders as the reason for dismissal. In its opinion, the Eleventh Circuit held that lesser sanctions than dismissal should be imposed against Bettis, and it also rejected Bettis's argument concerning recusal and alleged bias. The panel noted that *"Bettis has established no bias—or even an appearance of bias.* Moreover, a review of the record establishes that the court was even-handed in resolving the motions before it." *Bettis v. Toys "R" Us,* 273 Fed.Appx. 814, 820 (11th Cir.2008); Case No. 06–80334–CIV–ZLOCH, DE 135, p. 820 (Opinion of the Eleventh Circuit) (emphasis added). The Eleventh Circuit

went on to note that *"[Bettis] is attempting to create an appearance of impropriety to further her request for recusal and reassignment.* There is no appearance of impropriety." *Id.* (emphasis added). The case was then remanded to consider lesser sanctions, and summary judgment was eventually granted for Toys "R" Us. DE Nos. 153 & 154.

While both the *Sabatier* and *Bettis* cases were on appeal, Plaintiff Sonya Gossard sued her former employer JP Morgan and the case was assigned to me. She claimed that she was discriminated against by JP Morgan on a variety of bases. After Defendant moved for summary judgment, the Court found that no genuine issues of material fact existed for a jury to determine, and the Court entered Judgment in favor of Defendant. *See Gossard v. JP Morgan Chase & Co.,* Case No. 08–60565–CIV–ZLOCH, DE Nos. 59 & 60.

After Judgment was entered in *Bettis* and *Gossard,* and six months after the Mandate was handed down in *Sabatier,* Plaintiffs, all represented by Mr. Spolter, filed Motions For Reconsideration and Recusal in the above-styled causes, which again raised as a basis for recusal my Catholic faith, some of my law clerks' education, and my connections to the Federalist Society. DE 156.[2] This time the Motions had an added twist: Plaintiff now claimed that I had rigged the blind, random case assignment system for cases filed in the Southern District of Florida, so that I would receive a disproportionate number of Plaintiff's cases in order to dismiss them unjustly. *See* DE 156, pp. 13–20. An almost identical motion was filed in each of the above-styled causes. While the Motions were pending, and despite the prohibitions of Local Rule 77.2.A.7.E, Mr. Spolter sat for an interview with a local tabloid to showcase his accusa-

---

**2.** The Motions in *Bettis* and *Gossard* also raise grounds for reconsideration of the judgments entered therein. They are not germane to the proceedings covered by this Order.

tions. *See* John Pacenti, *Lawyer Say Statistics Prove He's Been Treated Unfairly* Daily Business Review, June 8, 2009, at A1. In the Motions, Mr. Spolter also sought a public airing of his accusations, presumably other than the one the tabloid provided. *Id.* p. 21. And the Court obliged. DE 173.

In an effort "to fully develop the record in these cases, to ensure the Parties' and the public's confidence in an honest and independent judiciary, and to determine the truth of the matters at issue," I referred the matter to United States Magistrate Judge Robin S. Rosenbaum for an evidentiary hearing. DE 173, p. 2. Additionally, I directed that all Clerk's office personnel who handled the assignment of Mr. Spolter's cases be made available for Plaintiffs to examine and that Plaintiffs were free to call whatever witnesses Mr. Spolter felt would be necessary to substantiate his allegations. The only exception was me; pursuant to Federal Rule of Evidence 605, I cannot be called upon as a witness.

In the Order of Referral, the Court directed Magistrate Judge Rosenbaum to make specific findings, aside from any other findings she found it necessary to make, concerning the following questions:

a. whether Plaintiffs' Motions cited above were presented for an improper purpose;

b. whether a reasonable attorney in like circumstances could believe Plaintiffs' claims that the undersigned has manipulated the blind, random case assignment system in the Southern District of Florida were factually and legally justified;

c. whether the undersigned has in any way manipulated the case assignment system in the Southern District of Florida generally;

d. whether the undersigned has in any way manipulated the case assignment system in the Southern District of Florida specifically concerning cases filed by Plaintiffs' Counsel Mr. Loring Spolter, Esq.; and

e. whether the undersigned has ever directed any individual in the Clerk's office to manipulate the case assignment system generally or with respect to cases filed by Mr. Spolter.

DE 173, pp. 2–3. After holding two days of hearings, Magistrate Judge Rosenbaum issued a 92–page Report and Recommendation. DE 205. As to points three through five, she found that there was no evidence whatsoever that the case assignment system in this District was manipulated by the undersigned or any other person. DE 205, p. 1322. Nothing can be added to points three through five. A thorough review of the transcript establishes the intricacies of the computerized case assignment system, and why it borders on the impossible for anyone to manipulate it. In addition, Magistrate Judge Rosenbaum found, and the record establishes, that Plaintiff's expert, Professor Dragan Radulovic, Ph.D., relied on data and assumptions about the case assignment system that were both supplied by Mr. Spolter and wholly inaccurate. These false assumptions could have been easily discovered by anyone who read the Local Rules and Internal Operating Procedures of this District. And this information was particularly available to Mr. Spolter, who is a member of the Southern District Bar and was notified of the Internal Operating Procedures and certain preferences in the assignment of cases by a letter dated March 6, 2009, sent to him by the Clerk of the Court in response to his Freedom Of Information Act ("FOIA") request. Clerk's Exhibit 9.[3] Even a cursory review

---

3. The citation to Clerk's Exhibits and Plain- tiffs' Exhibits are, unless otherwise specifical-

of the Local Rules and the Internal Operating Procedures, which were highlighted to Mr. Spolter in the letter from the Clerk of the Court, shows that the case assignment system is not a matter of Judges getting cases as if they were drawn from a hat. That simplistic and mendacious assumption was at the heart of Mr. Spolter's analysis.

After reviewing the evidence and Plaintiffs' Motions To Recuse, Magistrate Judge Rosenbaum found that they were presented for an improper purpose. *Id.* p. 1341. She also found that "the record in this case precludes a finding that a reasonable attorney in like circumstances to that of Mr. Spolter could believe that Plaintiffs' claims that a reasonable person could conclude that Judge Zloch manipulated the blind, random case assignment system in the Southern District of Florida were factually justified." DE 205, p. 1330. And that because "nothing in the record supports the idea that Judge Zloch either manipulated or caused the manipulation of the District's case-assignment system.... Mr. Spolter's recusal motions are, consequently, not legally justified." *Id.* p. 1332. These findings and conclusions are sound and will not be disturbed. The additional comments herein are merely offered in support of Judge Rosenbaum's findings.

## I.

Much of Judge Rosenbaum's ultimate finding that the Motions were not factually justified at the time they were filed was based on the publically available information about the case assignment system and the letter from the Clerk of the Court Mr. Spolter received concerning it. She states:

> While Mr. Spolter could not have uncovered all of the details of the manner in which the District's case-assignment

system works prior to filing his recusal motions, a "reasonably competent attorney" in Mr. Spolter's place would have known enough to recognize that the District's case-assignment program does not operate on a "100%" pure blind, random system. Consequently, a "reasonably competent attorney" would not have instructed an expert to conduct a study based on that incorrect assumption. By engaging in precisely that conduct, however, Mr. Spolter effectively designed the study to be useless. He compounded his error by basing his contentions that a reasonable person could believe that the District's case-assignment system was "rigged" solely on the expert's conclusion that Mr. Spolter's cases were assigned to Judge Zloch in a manner statistically inconsistent with the operation of a system that Mr. Spolter should have known for a fact to be nonexistent in the Southern District of Florida.

DE 205, p. 1330. Judge Rosenbaum is completely correct: the Local Rules and the Internal Operating Procedures make clear that cases are not assigned on a pure blind, random system.

But there is another level of fault in Spolter's behavior beyond his willful ignorance of the Rules and Operating Procedures of this District and the fact that the information he supplied his Expert with was mendacious. If Mr. Spolter truly believed, as he has stated, that the system was rigged and that he had to blow the whistle, then he went about it completely the wrong way. Indeed, the way he pursued his claim reeks of a lawyer operating in bad faith.

Mr. Spolter may not have been able to uncover all of the logarithms and assign-

ly referenced, those that were entered into evidence at the Evidentiary Hearing held be-

fore Magistrate Judge Rosenbaum.

ment-system nuances that were explained at the hearing by reviewing the Local Rules, the Internal Operating Procedures, and Mr. Larimore's letter to him. But had he professionally and personally approached me, the Chief Judge of this District, or the Clerk with these concerns, then supplemental information would have been made available to him. These were not petty allegations that Mr. Spolter made. They cut at the heart of the integrity of the Federal Judiciary: they accuse an Article III judge of a crime. 18 U.S.C. §§ 1503, 1509, 2071, 2076. (various crimes that involve tampering with Clerk's Office personnel, reports, and documents).

Before broadcasting these concerns to the world, prudence and good sense dictate that they should have first been taken to me, and in the event my response was unsatisfactory, then to the Chief Judge and the Clerk of the Court. If both of those options proved unsatisfactory, then the matter should be taken to the Chief Judge of the Circuit with a formal complaint. In that way, the truth would have been easily ascertained. 28 U.S.C. §§ 351–368 (2006) (prescribing the procedure for investigation of judicial misconduct); *see also* The Rules For Judicial Conduct And Judicial Disability Rules 6 & 7. If the error had been on Mr. Spolter and his assumptions, then no harm, no foul. The matter would have been cleared up without besmirching anyone's name publically and incurring thousands of dollars in attorney's fees. And if, on the other hand, Mr. Spolter had been correct that there were some shenanigans afoot, then the Chief Judge of this District or Circuit would surely have quickly investigated and remedied it. *Id.* However, filing the subject Motions For Recusal and running to the press with a cockamamie conspiracy theory speaks to Mr. Spolter's ill-motive far more than a search for the truth and the best interests of his clients.

On this point, Mr. Spolter could argue that his formal FOIA request sent in February of 2009 satisfies the burden of decency placed on him as a human being and Officer of this Court; but the request was ridiculous. On February 23, 2009, Mr. Spolter sent a FOIA request to me, Chief Judge Moreno, and Steven Larimore, Esq., the Clerk of the Court. He requested:

1. Case numbers of all civil cases first assigned to Judge William Zloch during calendar years 2005, 2006, 2007, 2008 and 2009.

2. All Notices of Ripeness (pertaining to pending rulings) and/or Pleadings of Ripeness (pertaining to pending rulings) filed with the Clerk of the Court during calendar years 2005, 2006, 2007, 2008 and 2009 in civil court cases presided over by Judge William Zloch.

3. All written policies and/or rules and/or guidelines in effect during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or newly filed cases.

4. All written communications from any and all judges dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases.

5. All written communications from the Clerk of the Court dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases.

6. All written policies and/or rules and/or guidelines in effect during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases for which county of occurrence effects and/or relates to said assignments(s).

7. All written communications from any and all judges dated during calendar years 2005, 2006, 2007, 2008 and 2009

pertaining to assignment of judges on some and/or all newly filed cases for which county of occurrence effects and/or relates to said assignments(s) [sic].

8. All written communications from the Clerk of the Court dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases for which county of occurrence effects and/or relates to said assignments(s) [sic].

9. Any and all documents drafted and or generated during calendar years 2005, 2006, 2007, 2008 and 2009 stating and/or reflecting the number of civil cases assigned to specific judges.

10. Any and all documents drafted and or generated during calendar years 2005, 2006, 2007, 2008 and 2009 stating and/or reflecting the number of cases based on civil cause(s) of action assigned to specific judges, regardless whether [sic] cases were newly filed and/or previously filed.

11. For all judicial clerks who have reported and/or currently report to Judge William Zloch during calendar years 2000 through present, provide the following:

a. Documents indicating the names of all such clerks;

b. Documents indicating the law schools attended by all such clerks;

c. All documents submitted by said clerks for purposes of obtaining employment.

12. All documents Judge William Zloch has submitted to local and/or Washington, D.C. governmental addresses pertaining to actual and/or potential conflicts of interests during calendar years 2000 through present.

13. All documents Judge William Zloch has submitted to local governmental offices and/or Washington, D.C.

governmental addresses or governmental addresses elsewhere pertaining to functions, programs, seminars and/or continuing education programs attended during calendar years 2000 through present.

14. All documents Judge William Zloch has submitted to local governmental offices and/or governmental offices in Washington, D.C. or elsewhere pertaining to functions, programs, seminars and/or continuing education programs attended by Judge Zloch during calendar years 2000 through present which were sponsored, organized, hosted, established or otherwise directed by any entity not a part of the United States Government.

15. All documents Judge William Zloch has submitted to local governmental offices and/or governmental offices in Washington, D.C. or elsewhere pertaining to functions, programs, seminars and/or continuing education programs attended by Judge Zloch during calendar years 2000 through present which were sponsored, organized, hosted, established or otherwise directed by any entity not a part of the United States Government.

16. All documents, including but not limited to directives, memos, memorandums, policies, guidelines and/or instructions indicating that any lawsuit filed by Attorney Loring Spolter should be assigned to any specific judge and/or should be treated for judge assignment purposes in a manner other than how cases are generally handled and/or assigned.

17. Other than lawsuits or other pleadings filed by litigants or orders which the Court has actually provided copies via PACER to Loring Spolter, provide all documents, including but not limited to directives, memos, memorandums,

policies, guidelines and/or instructions mentioning, pertaining to, or otherwise naming or specifically relating/pertaining to attorney Loring Spolter.

18. Any and all documents, including but not limited to directives, memos, memorandums, policies, guidelines and/or instructions indicating a reason, basis, opportunity and/or other purpose to re-submit or delete to/from the Southern District of Florida website information that does not list the name of the law school law clerks(s) [sic] attended.

19. Any and all documents, including but not limited to directives, memos, memorandums, policies, guidelines and/or instructions indicating a reason, basis, opportunity and/or other purpose to re-submit or delete to/from the Southern District of Florida United States District Court website information that does not list the name of the law school law clerks(s) [sic] attended.

20. Any and documents [sic] which request, direct or instruct that information be deleted from the website of the Southern District of Florida the names of law schools which were attended by Judge Zloch's legal/law clerks.

21. Any and all documents indicating the date for which the names of law schools which were attended by Judge Zloch's legal/law clerks were deleted and/or otherwise removed from the website of the Southern District of Florida United States District Court.

22. All documents stating the policy/each policy from year 2004 through present as to which documents and/or materials within the possession of the Clerk of the Court, The [sic] office/chambers of the Chief Judge and/or of Judge Zloch which do fall within the jurisdiction of the Freedom of Information Act.

23. All documents stating the policy/each policy from year 2004 through present as to which documents and/or materials within the possession of the Clerk of the Court, The [sic] office/chambers of the Chief Judge and/or of Judge Zloch which are exempt from the jurisdiction of the Freedom of Information Act.

24. All computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on any basis other than 100% randomness.

25. Pertaining to computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on any basis other than 100% randomness, produce all documents relating to which individual(s) requested the purchase, obtaining and/or use of same.

26. Pertaining to computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on any basis other than 100% randomness, produce all documents relating to which individual(s) authorized the purchase, obtaining and/or use of same.

27. Pertaining to computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on any basis other than 100% randomness, produce all documents relating to the costs and/or expenses in

dollar and/or hours-time for obtaining and completed installation of same.

Clerk's Exhibit 9. This litany of demands is not a legitimate attempt to understand why I have been assigned more of Mr. Spolter's cases than other Judges; it is harassment.

To come to me or the Chief Judge of this District or the Chief of this Circuit to discover how the case assignment system works, Mr. Spolter only had to do so in a manner that gave weight to the seriousness of his allegations and his honest concern for his clients and cases. But that is not what Mr. Spolter did. Instead, he sent that insipid and inane FOIA request, even though the Judiciary is exempt from its requirements. 5 U.S.C. §§ 551(1)(B), 552(f). The FOIA request did not state that Mr. Spolter was concerned that more of his cases are being assigned to me than the case assignment system should provide. That FOIA request is not a legitimate attempt to understand the case assignment system, and it does not qualify as a serious probe of the truth. What it does is reveal Mr. Spolter's true intention: harassment of the Judiciary with a fishing expedition. Requests in that form belie an honest search for the truth and reflect the bad faith that motivated and permeated Mr. Spolter's Motions.

## II.

On page 1332 of the Report and Recommendation Magistrate Judge Rosenbaum found that regarding the factual record Mr. Spolter was aware of at the time he filed his motion, " 'an objective disinterested lay observer, fully informed of the facts underlying [Mr. Spolter's hypothesis that Judge Zloch had done so] [could not] entertain a significant doubt' about Judge Zloch's impartiality, and Mr. Spolter's recusal motions are, consequently, not legally justified." DE 205, p. 1332. There is no question that Mr. Spolter provided his Expert with a knowingly fraudulent set of data. But this fact is not the end of the analysis: Mr. Spolter also included in his Motion, again, that my faith, some of my law clerks' education, and my association with the Federalist Society was a basis for recusal. DE 156–2, pp. 14–16. Not only was there no statistically valid reason to claim that the case assignment system was rigged and nothing but blind, malicious conjecture suggested that I was involved in such a scheme, there was no legitimate factual or legal reason for Mr. Spolter to re-argue the points raised in his first Motions For Recusal. The fact that they are amplified by attacks upon the Honorable Daniel A. Manion, Circuit Judge for the United States Court of Appeals for the Seventh Circuit and other baseless conjecture concerning my previous service on the Financial Disclosure Committee does not change the fact that these points are again raised by Mr. Spolter as providing a basis for recusal.

As noted above, in *Sabatier*, Mr. Spolter previously raised those issues as providing a basis for recusal, and I found that he did not establish grounds for recusal from the case. Case No. 06–20418–CIV–ZLOCH, DE 61. The same issue was then raised on appeal in both *Sabatier* and *Bettis*, and, by two separate panels, the Eleventh Circuit found the argument meritless. *Sabatier*, 301 Fed.Appx. at 915; *Bettis*, 273 Fed.Appx. at 820. To continue to argue this point is to ignore the authority of this Court and the Eleventh Circuit. The issue has been well-settled in federal court: a Judges's faith is not a basis for recusal. *Idaho v. Freeman*, 507 F.Supp. 706, 729 (D.Idaho 1981); *see also Macdraw, Inc. v. CIT Group Equip. Fin., Inc.*, 994 F.Supp. 447 (S.D.N.Y.1997), *aff'd* 138 F.3d 33, 37 (2d Cir.1998) ("Courts have repeatedly held that matters such as race or ethnicity are improper bases for challenging a judge's impartiality."). And it is the law of the case in *Bettis* and *Sabatier* that those

points do not provide a basis for me to recuse. If Mr. Spolter felt that the Court of Appeals rulings were in error then he should have sought rehearing, rehearing *en banc,* or petition for a writ of certiorari from the Supreme Court. But ignoring a reviewing court's determination by raising an already-decided issue is, to say the very least, improper. *DeSisto College, Inc. v. Line,* 888 F.2d 755, 757 (11th Cir.1989).

The Court is at a loss in trying to imagine a similar case where a party has raised an argument for recusal in the District Court that is rejected; then it is raised in the Court of Appeals, and the District Court is affirmed; the Party does not seek an *en banc* ruling or seek certiorari review; instead, months after the Mandate is handed down, Counsel raises the recusal issue again in the District Court where nothing remains pending. That is exactly what has happened here. When Mr. Spolter raises the argument for recusal on the basis of my faith, some of my law clerks' education, and my affiliation with the Federalist Society again, all he is doing is restating those points more emphatically, using more exclamation points, and ramping up the accusations. These issues have been raised, and they have been decided; they cannot be raised by motion again. *Id.; In re Evergreen Security, Ltd.,* 570 F.3d 1257, 1274–75 (11th Cir.2009). Thus, the Court concurs with Judge Rosenbaum's finding that there is no legal basis for Mr. Spolter to believe that he may reargue those points in his Motions to Recuse.

## III.

Magistrate Judge Rosenbaum analyzed the recent Eleventh Circuit case *In re Evergreen* very closely, and she applied the six factors discussed there to this case: one, making assumptions and jumping to conclusions; two, delay in having a hearing; three, ignoring decisions of higher courts; four, continuing to pursue argu-

ments denied by the court on multiple occasions; five, making public allegations; sixth, making allegations fantastic in nature. Looking at the second factor of "delay," Magistrate Judge Rosenbaum looked at Mr. Spolter's behavior surrounding the recusal motions, and stated that "the Court does not find that Mr. Spolter stalled the recusal proceedings." DE 205, p. 1339. Much of the language in *In re Evergreen* suggests that the inquiry for sanctions in that case was limited to the actual recusal motions and the behavior that surrounded and accompanied their filing alone. *In re Evergreen,* 570 F.3d at 1274–75.

In the Report, Magistrate Judge Rosenbaum analyzed Mr. Spolter's behavior concerning the Evidentiary Hearing alone. And while this narrow view of Spolter's behavior comports with *In re Evergreen's* language, Spolter's filings suggest untoward delay in another form. But before addressing the recusal motions in the larger scheme of Mr. Spolter's tendency to habitually delay and needlessly prolong issues, the Court pauses to address certain elements that were disturbing in Spolter's behavior that Magistrate Judge Rosenbaum did not discuss.

A.

It is clear that Mr. Spolter did not continually request extensions of the Evidentiary Hearings. But in analyzing Mr. Spolter's behavior, it is essential to remember that before any motion can be filed in Federal Court the movant's "factual contentions [must] have evidentiary support or, if specifically so identified, be likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). This is the bare minimum; indeed, it is a necessary condition to filing any motion. Consequently, once a motion is filed, the Court should be able to imme-

diately call upon Mr. Spolter and ask that he present sufficient evidence to establish that his filing comports with Rule 11(b)(3). That is the normative standard that honest attorneys should hold their filings to. If there is sufficient evidence to file such a motion, than its production should be of no consequence.

Mr. Spolter may not have stepped over the line with his delays and the recusal motions, but he did toe the line. He responded to the Order of Referral with an initial request to continue the hearing, which Magistrate Judge Rosenbaum granted. *See* DE 177 (Spolter's Motion); DE 180 (Order granting Spolter's Motion). He also filed a witness list for the hearing after the deadline for doing so. This list included me and Chief Judge Moreno, DE 184, despite the fact that the Order of Referral stated that the undersigned could not be called to testify. DE 172; Fed. R.Evid. 605. And there was no basis to call Chief Judge Moreno, other than Spolter's hope that the hearing would be, like his FOIA request, a fishing expedition. Magistrate Judge Rosenbaum struck both from the witness list. DE 185. The Evidentiary Hearing was meant for Mr. Spolter to establish in the Record the factual basis for his filings and give a public airing to the evidence that he had in support of them, all of which he should have been able to do ten seconds after filing the Motions.

The day before the Evidentiary Hearing, Mr. Spolter filed a Response And Objection Of Counsel For All Named Plaintiffs (DE 188); in it he sought to vacate the Order of Referral and again sought to refer the Motions To Recuse to Chief Judge Moreno. To avoid any delay on Mr. Spolter's part at the hearing, the Motion was denied that evening. DE 194. As discussed in greater detail elsewhere, nothing demands that a frivolous motion to recuse be referred to the Chief Judge. *In*

*re Evergreen,* 570 F.3d at 1279; *see also* DE 194 (Order denying Motion). But despite my ruling on the issue, this same objection was again raised by Mr. Spolter at the beginning of the hearing. DE 211, Hearing Transcript pp. 2–9.

At the hearing Mr. Spolter had no evidence to present: his Expert had based his Report on fundamentally false assumptions supplied by Mr. Spolter, and the Expert completely disavowed his Report when the true nature of the case assignment system was, for the first time, made known to him. DE 211, Hearing Transcript pp. 90–121, 139–142; *see also* DE 205, pp. 1318–20 (discussing this point). Spolter knew this long before filing the Motions and appearing for the hearing; at the very least he learned of it when he received Mr. Larimore's letter in March. Decency and respect for Magistrate Judge Rosenbaum's time demanded that he admit the same and move to cancel the hearing and spare the Court, the attorneys, and the Clerk's office staff the time and expense of attending to his baseless allegations. Instead, the transcript reflects that Mr. Spolter proceeded to persist with meandering questions that had no bearing on the issue at hand. Reading the transcript, it is a testament to Magistrate Judge Rosenbaum's patience and judicial temperament that she allowed the hearing to persist as long as it did. Mr. Spolter cannot claim that he did not have his day in court; indeed, Judge Rosenbaum gave him every opportunity to make his case.

As noted above, Mr. Spolter's only evidence in support of his Motions was his Expert. The fact that he called Mr. Larimore only detracted from his case. He spent the better part of the examination bickering with Mr. Larimore about what the ideal case assignment system would be, until Magistrate Judge Rosenbaum reminded Mr. Spolter that the witness was

there only to testify regarding what the case assignment system actually is and whether it was manipulated. After Mr. Spolter failed to present any evidence in support of his position, the Clerk's Office put on its clinic on the integrity and workings of the case assignment system. Magistrate Judge Rosenbaum then made her finding that there was no evidence to support Mr. Spolter's accusation that the case assignment system was manipulated.

After announcing her finding from the bench, she gave Mr. Spolter the option to proceed or continue the hearing for the opportunity to marshal evidence and prepare his argument. He requested two weeks to prepare a further defense to the first two findings that she was directed to make. Due to scheduling conflicts only a one-week extension was available, and it was given. In fairness to Mr. Spolter, the Record reflects that Judge Rosenbaum announced her finding late in the afternoon. But the purpose of the extension was for Mr. Spolter to prepare a defense: the same defense that he should have been prepared to present at the time he filed the Motions.

The second day of hearings was limited to determining Mr. Spolter's purpose in filing the motions: rather than presenting a defense that he thought would take two weeks to prepare, Mr. Spolter stood on his pleadings. There was no justification, no apology, nothing to suggest he saw his error and felt a modicum of embarrassment or remorse; he was indignant to the end.

If Mr. Spolter was honest and earnestly seeking the truth in these matters in good faith, as soon as the truth of the case assignment system was brought out at the hearing and his Expert disavowed the Report, Mr. Spolter should have apologized and moved to withdraw the Motions. But he did not choose a mature or honest course of action that any attorney operating in good faith would have chosen. Instead, he persisted with the assertion that he was justified in his filings. Such behavior speaks volumes to the bad faith that motivated Mr. Spolter's filing and prosecution of his Motion (DE 156). He may at times have had a professional tone, especially in the hearing with Magistrate Judge Rosenbaum, but the balance of his behavior, particularly in his filings, is grossly unprofessional to say the least.

B.

Aside from that behavior, which establishes both an improper purpose and subjective bad faith, it is important to note how the Motions To Recuse and the delay that attached to them fell within the grander scheme of Mr. Spolter's cases. 5A Wright & Miller, *Federal Practice & Procedure:* Civil 3d § 1335 (2009) (discussing a pattern of abusive litigation activity). In *Bettis* and *Gossard,* Mr. Spolter waited until after Judgment was entered in favor of the Defendants to seek my recusal; in *Sabatier* the Court was already affirmed by the Court of Appeals and the Mandate had been returned before he sought recusal. What the Motions To Recuse did was prolong the already final litigation.

The Motions To Recuse filed in *Bettis* and *Gossard* were embedded in his Motions For Reconsideration. And the timing of these Motions was calculated: in Mr. Spolter's own words, his training and experience in statistics alerted him to the fact that all was not right. DE 211, Hearing Transcript p. 6. This happened sometime before his FOIA request, dated March 6, 2009. In fact, his supposed confirmation, the fallacious Expert's Report, was prepared on April 8, 2009, a week before the Court issued its ruling on summary judgment in *Bettis.* DE 155. These Motions and arguments gave every indication of serving a three-fold purpose. First, they furthered his public attacks

against a member of the Judiciary. Second, they were also nothing short of an attempt to intimidate the Judiciary into recusal or into granting the Motions For Reconsideration. Third, they placed an additional financial burden on Defendants. Defendants in these cases must wonder why their attorney's fees in routine employment-discrimination cases are so high; this would be especially true in *Sabatier* where they already stood vindicated by the Court of Appeals.

These Motions are the tell-tale sign of a vexatious litigant. 28 U.S.C. § 1927. The Motions To Recuse were not filed until after Mr. Spolter had lost his cases. And the timing of this and the nature of the pleadings signal an attorney who would drive the opposing side into a settlement by making the cost of litigation prohibitively expensive. General Counsel at Toys "R" Us and JP Morgan would likely shudder at the thought of continuing litigation against Mr. Spolter: even when Mr. Spolter's client loses in the District Court and Court of Appeals, he can still manage to drag on the case and rack up fees. Indeed, Mr. Spolter has added a new chapter in the book of slash-and-burn litigation; he would not only take on opposing counsel but the Judiciary as well.

The timing of these motions bespeaks an attorney who will not follow the proper course in litigating his cases, who has no regard for Orders of the Court and decisions of the Court of Appeals, and who instead pursues every avenue of harassment in hopes that a settlement-out-of-exhaustion is reached by a cost-conscious defendant. This constant and calculated delay, cloaked in vexatious and baseless filings, speaks to Mr. Spolter's bad faith.

## IV.

Mr. Spolter has made much of the Court referring this matter to Magistrate Judge Rosenbaum for an evidentiary hearing, and a brief comment on this point is necessary. *See* DE 217. Mr. Spolter argues that holding an evidentiary hearing was improper, but a review of Mr. Spolter's Motion (DE 156) seeking my recusal and disqualification in these cases establishes that Mr. Spolter himself wanted a public airing of his allegations concerning the alleged "rigging" of the Court's blind, random assignment system. DE 156–2 at 8. Indeed, he asserted that " '[t]he suggestion that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow .... Such charges, to the extent they are being raised, must not remain unexamined and unanswered.' " *Id.* (quoting *Cruz v. Abbate*, 812 F.2d 571, 573–74 (9th Cir.1987)).

The Order of Referral made available to Mr. Spolter all Clerk's Office personnel he requires to prove his contentions. Moreover, he was on notice that he was "to present testimony and other evidence giving factual support for the allegations. concerning the undersigned's supposed manipulation of the blind, random case assignment system." DE 173, p. 4. Mr. Spolter was free to call any witness he wanted in support of his Motions. Indeed, he called the Court Administrator and Clerk of the Court Steven Larimore and Spolter's own Expert. If there was anyone else with information to support Mr. Spolter's allegations, he was on notice that he was free to call them. *Id.*

The evidentiary hearing was ordered in response to Mr. Spolter's request and to fully develop the record in these cases, to "ensure the Parties' and the public's confidence in an honest and independent judiciary, and to determine the truth of the matters at issue." DE 173, p. 2. There was nothing improper about investigating Mr. Spolter's claims, giving him a public forum to air his evidence, and allowing him

to set forth his factual basis for making the allegations contained in his Motions.

To the extent that Mr. Spolter objects to the hearing on the basis that it was a Rule 11 hearing, it is of no moment. Mr. Spolter has attempted to read into Eleventh Circuit case law a statement that is not there. In his objection, he states:

First, the Order of Referral made no reference to Rule 11, nor was any Rule 11 motion pending at the time of the Order of Referral. Second, under Rule 11, the Court may initiate a *sua sponte* Rule 11 proceeding only by issuing an order to show cause. Fed.R.Civ.P. 11(c)(3); *see, e.g., Kaplan v. Daimler-Chrysler, A.G.,* 331 F.3d 1251, 1255 (11th Cir.2003).

DE 217, p. 3. The phrase "only by issuing an order to show cause" does not appear in the text of Rule 11, and it does not appear in the text of *Kaplan.* Rather, the Advisory Committee notes to Rule 11 and the Eleventh Circuit case law establish that the "initiating court must employ (1) a "show-cause" order to provide notice and an opportunity to be heard." *Kaplan,* 331 F.3d at 1255. Clearly, nothing in Rule 11 or the governing caselaw prohibits "a proceeding" before a show cause order; the caselaw merely prohibits imposing sanctions prior to a show cause order.

And there is no question that the Court's Order of Referral alerted Mr. Spolter to the fact that he needed to produce evidence to establish that his Motion was licit under Rule 11. The question remaining and the one for which the Court is contemporaneously issuing an Order To Show Cause is whether sanctions should be imposed for engaging in such conduct. There is nothing improper in the Court directing Magistrate Judge Rosenbaum to make findings as to whether Mr. Spolter violated Rule 11, and her doing the same, by inquiring whether his filings were not factually and legally justified, or filed for an illegitimate purpose.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Objections filed in each of the above-styled causes *Renee Bettis v. Toys "R" Us, Inc.,* Case No. 06–80334–CIV–ZLOCH (DE 217); *Gossard v. JP Morgan Chase & Co.,* Case No. 08–60565–CIV–ZLOCH (DE 109); *Sabatier v. SunTrust Bank,* Case No. 06–20418–CIV–ZLOCH (DE 118); *Paul v. D & B Tile of Hialeah, Inc.,* Case No. 09–60259–CIV–ZLOCH (DE 41) be and the same are hereby **OVERRULED;**

2. The Report and Recommendation (DE 205) filed herein by United States Magistrate Judge Robin S. Rosenbaum be and the same is hereby approved, adopted, and ratified, with the additional comments of the Court made in this Order.

### *REPORT AND RECOMMENDATION*

ROBIN S. ROSENBAUM, United States Magistrate Judge.

This matter is before the Court upon the Orders of Referral to United States Magistrate Judge Robin S. Rosenbaum re: Evidentiary Hearing, [*Bettis* : D.E. 173; *Gossard,* D.E. 72; *Sabatier,* D.E. 82; *Paul,* D.E. 6], entered by the Honorable William J. Zloch. In accordance with the Orders of Referral, the Court held evidentiary hearings on June 24 and July 2, 2009, for the purpose of determining whether, in fact, as suggested by Plaintiffs' counsel in his various recusal motions filed in the four above-referenced cases, a reasonable person could believe that Judge Zloch or anyone else had improperly manipulated the blind, random assignment of cases in the Southern District of Florida. Upon consideration of the record in each of the

above-captioned cases, as well as the evidence and argument presented at the hearings held on June 24 and July 2, 2009, I make this Report and Recommendation.

## I. Background

Loring N. Spolter, Esq., is a member of the Florida Bar and the Bar of the Southern District of Florida. In his capacity as an attorney, Mr. Spolter has appeared as counsel of record in approximately 119 cases in the Southern District of Florida since 1994. *Bettis:* D.E. 156–4 at 1; *Gossard,* D.E. 63–2 at 1; *Sabatier,* D.E. 81–2 at 1; *Paul,* D.E. 3–2. Among those cases, Mr. Spolter has appeared as counsel of record in the four above-captioned matters, where he filed the recusal motions at issue before the Court. The Court therefore summarizes the salient facts and procedural backgrounds of these cases, which resulted in the referral to me for an evidentiary hearing on the pending motions.

### A. Bettis v. Toys "R" Us, Case No. 06–80334–CIV–ZLOCH ("Bettis")

On behalf of Renee Bettis, Mr. Spolter filed *Bettis* on April 6, 2006. D.E. 1.[1] Ms. Bettis had been employed by Toys "R" Us from May, 2004, until approximately August, 2005, when she was fired from her position. D.E. 24 at ¶¶ 23–62. In the First Amended Complaint [D.E. 24], Ms. Bettis alleged that Toys "R" Us had taken adverse employment action against her because of her gender and the fact that she was pregnant. *See id.* She asserted seven claims under (1) Title VII, 42 U.S.C. §§ 2000e, *et seq.;* (2) the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"); (3) the Florida Civil Rights Act, Fla. Stat. §§ 760.01, *et seq.* ("FCRA"); and (4) the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA").

Soon after Ms. Bettis served Toys "R" Us, on July 10, 2006, the Court entered a scheduling order setting the pre-trial conference date for June 29, 2007, and directing the parties to file their pretrial stipulation by June 15, 2007. [D.E. 6].

During the course of discovery, Toys "R" Us filed a motion for a protective order seeking to shield it from having to respond to Ms. Bettis's fourth set of requests to admit, which ultimately included 375 requests, and further asking for an award of fees incurred in filing the motion. *See* D.E. 28. On April 30, 2007, Ms. Bettis filed her opposition to the motion. Earlier that same day, however, the Court granted the motion for protective order, finding the fourth set of requests to admit to be "duplicative, redundant, and overly burdensome upon [Toys "R" Us]." D.E. 38. In the same Order, the Court denied Toys "R" Us's fee request. *See id.*

In accordance with the Court's July 10, 2006, Scheduling Order, Toys "R" Us filed its motion for summary judgment on April 30, 2007, later amending the motion after learning that Ms. Bettis had not disclosed her bankruptcy filing during her depositions. *See* D.E. 39, 104. Ms. Bettis requested an extension of time within which to respond to Toys "R" Us's summary judgment motion, *see* D.E. 78, which Judge Zloch granted. *See* D.E. 84.

On June 14, 2007, after 5 p.m., Mr. Spolter, on behalf of Ms. Bettis, filed a motion for extension of time to submit the pre-trial stipulation that was due the following day, pursuant to the Court's July 10, 2006, Scheduling Order. D.E. 114, D.E. 135 at 817 n. 2. Toys "R" Us responded, asserting that it had made several attempts to coordinate the pre-trial statement with Mr. Spolter, but Mr. Spolter

---

1. In this subsection, all references to the docket are to the *Bettis* docket unless otherwise specifically indicated.

had refused to respond and instead had waited until the day before the stipulation was due to seek the extension. D.E. 115. On June 21, 2007, the Court *sua sponte* issued its Final Order of Dismissal in the case, finding Ms. Bettis in violation of the July 10, 2006, Scheduling Order and dismissing Ms. Bettis's claims without prejudice. *See* D.E. 122.

Ms. Bettis appealed. *See* D.E. 126, D.E. 127. Although the Eleventh Circuit initially dismissed Ms. Bettis's appeal on October 24, 2007, for want of prosecution because Ms. Bettis failed to file a Civil Appeal Statement form within the time fixed by the rules, it subsequently reinstated her appeal when it granted Ms. Bettis's Petition for Rehearing *En Banc*, which it construed as a motion to reinstate the appeal and a motion for reconsideration of the October 24, 2007, order. D.E. 130. On appeal, Ms. Bettis challenged the district court's dismissal without prejudice and the decision granting a protective order on Ms. Bettis's discovery requests. D.E. 135 at 817.[2] In addition, she argued that Judge Zloch should have recused himself because a reasonable person could believe that Judge Zloch's purported religious and political views resulted in an appearance of bias against working mothers such as Ms. Bettis, and the case should be reassigned to a different judge upon remand. *Id.*

In a decision dated April 10, 2008, the Eleventh Circuit held, in relevant part,

After a thorough review of the record, we conclude that the district court abused its discretion by dismissing the complaint. Although the record is replete with instances in which [Mr. Spol-

ter] failed to comply with court orders, and the court warned Bettis that the failure to comply could result in dismissal, there is no explicit finding that the conduct was willful and not mere negligence. And, based on the record before us, we cannot infer such a finding. Moreover, although the court imposed other sanctions, those sanctions were to compel discovery and did not include fines, contempt, or disciplinary actions against the attorney. Because the dismissal is, in effect, with prejudice[ [3]], the district court abused its discretion, and we vacate and remand with instructions for the court to consider other sanctions.
\* \* \* \* \*

[As it pertains to the district court's granting of Toys "R" Us's motion for a protective order relating to Ms. Bettis's fourth set of requests to admit,] [c]onsidering the court's inherent power to manage its docket, *Link [v. Wabash R.R. Co.]*, 370 U.S. [626,] 629–30, 82 S.Ct. 1386, 8 L.Ed.2d 734 [ (1962) ], we conclude that the court did not abuse its discretion. Bettis submitted her fourth request for admissions, which contained 399 requests. She then submitted a corrected version, which contained 375 requests. The case involved a single issue employment claim and the requests were repetitive and sought irrelevant information.

With respect to whether there was an abuse stemming from the court's granting of the motion prior to receiving Bettis's response, there was no error. Neither the Federal Rules of Civil Procedure nor the Local Rules require the

2. Each page in this docket entry contains two numbers: the page number placed on the document by the preparer of it (at the bottom of the page), and the page number stamped on the document by the CM/ECF system (generally across the top of the page). The page numbers cited in this Report and Recommen-

dation refer to the numbers imprinted by the CM/ECF system.

3. The statute of limitations had run on some of the causes of action prior to the entry of the Final Order of Dismissal.

court to obtain a response from the nonmoving party before ruling on a motion for a protective order. *See* Fed. R.Civ.P. 26; S.D. Fla. L.R. 26.1(H)(3).

* * * * *

Finally, Bettis argues that this court should assign the case to a different judge on remand because the district judge should have recused himself due [to] bias or the mere appearance of bias against working mothers in light of his connections to a conservative, Christian law school and other conservative organizations.[4]

Here, [where Ms. Bettis failed to seek recusal of the district court judge in the proceedings below,] there was no plain error in the judge's failure to *sua sponte* recuse. Bettis has established no bias— or even an appearance of bias. Moreover, a review of the record establishes that the court was even-handed in resolving the motions before it.

* * * * *

[W]e conclude reassignment is unnecessary. Notably, the facts Bettis relies upon to argue an appearance of impropriety were not before the district court. Rather, it seems that she is attempting to create an appearance of impropriety to further her request for recusal and reassignment. There is no appearance of impropriety....

D.E. 135 at 818–20. The Eleventh Circuit further excoriated Mr. Spolter, observing,

We note that the record reflects that throughout the litigation, [Mr. Spolter] was uncooperative, failed to correspond with defense counsel or to respond to defense counsel's communications, and failed to comply with the court's orders. In addition, during depositions, [Mr. Spolter] repeatedly instructed Bettis not to answer questions, interrupted defense counsel, and coached the witness.

*Id.* at 816 n. 1.

Following entry of the mandate, the case returned to the Southern District of Florida, where Judge Zloch renewed all motions that had been pending at the time that the Court had entered its Final Order of Dismissal, including the summary judgment motion filed by Toys "R" Us. D.E. 136. He then entered an order referring Toys "R" Us's motion for summary judgment to Magistrate Judge Lurana S. Snow for report and recommendation. *See* D.E. 139.

In her Report and Recommendation [D.E. 140], Magistrate Judge Snow recommended that the Court grant Toys "R" Us's motion for summary judgment as it related to Ms. Bettis's claims of discriminatory discharge under Title VII, the PDA and the FCRA, and interference with the exercise of her right to FMLA leave. *See id.*

With respect to Ms. Bettis's causes of action under Title VII, the PDA, and the FCRA for discrimination in the terms and conditions of employment based on Ms. Bettis's gender and pregnancy, Magistrate Judge Snow recommended the contrary. *Id.* at 15, 22. She based her recommendation on her conclusion that material facts remained in dispute regarding the claim of discriminatory failure to promote, as a result of "stray comments" made by Ms. Bettis's supervisor regarding pregnancy and motherhood. *Id.*

Both Ms. Bettis and Toys "R" Us filed objections to Magistrate Judge Snow's Report and Recommendation. *See* D.E. 143, D.E. 145. Upon consideration of the objections, the Court entered a 32–page

---

**4.** Specifically, Bettis argues that the judge's hiring of several law clerks from [Ave] Maria Law School, his financial support of that school, and his participation in organizations such as the Federalist Society establish bias. [Footnote 8 in 11th Circuit opinion].

order on April 13, 2009, overruling Ms. Bettis's objections to the Report and Recommendation, sustaining Toys "R" Us's objections, and granting summary judgment for Toys "R" Us on all counts. *See* D.E. 153. As a result of the order granting summary judgment, Judge Zloch entered final judgment for Toys "R" Us on April 13, 2009, 2009 WL 995476. *See* D.E. 154.

### Ms. Bettis's Motion for Reconsideration

Ms. Bettis filed her Motion for Reconsideration of Order Granting Summary Judgment and Judgment two weeks later. *See* D.E. 156. In this motion, Ms. Bettis challenged the Court's entry of summary judgment for Toys "R" Us. *See id.* Additionally, she sought to set aside the summary judgment order and the final judgment since, through Mr. Loring, she asserted, Judge Zloch had a duty to recuse himself from the case "because he knew the circumstances gave rise to a reasonable inference of impropriety or lack of impartiality." D.E. 156–2 at 6–7.[5] More specifically, Mr. Spolter, on behalf of Ms. Bettis, argued,

> Statistical evidence[ ] shows that Judge Zloch has taken actions against the undersigned and his clients in a non-neutral manner or at the very least, undisputed factual circumstances and case evidence cause the appearance that the integrity of what should have been a random or blind process by which Judge Zloch was assigned to the QUID case, and numerous other employment law cases filed by the undersigned, was improperly compromised.
> \* \* \* \* \*
> Of the fifteen lawsuits Spolter has filed in Federal Court since 2006 on behalf [of] persons alleging employment dis-

crimination, five were assigned to a single jurist, Judge Zloch. "We can conclude with at least 99.9% certainty that the mechanism responsible for judges' distributions was not random blind assignment . . . ."

*Id.* at 7–9.

In support of the assertion that statistical evidence provides a basis for the claim that "the mechanism responsible for judges' distributions was not random blind assignment," *id.* at 9, Mr. Spolter attached to the Motion for Reconsideration a report authored by Dragan Radulovic, Ph.D., an associated professor at Florida Atlantic University. *See* D.E. 156–4. At Mr. Spolter's request, among other tasks, Dr. Radulovic analyzed the judge assignment of the fifteen cases most recently filed by Mr. Spolter in the Southern District of Florida. *See* D.E. 156–4 at 4. In so doing, Dr. Radulovic assumed at Mr. Spolter's instruction that all active judges in the Southern District of Florida had an equal chance of being assigned any case filed at any location in the Southern District of Florida in the past 36 months. *See, generally, id.* Based on the fact that Judge Zloch was assigned five of these fifteen cases, and, further, assuming a total number of judges of between sixteen and twenty-four to whom assignments could have been made during the relevant time period, Dr. Radulovic determined with a degree of certainty greater than 99% that "the case assignment of lawsuits filed by Mr[.] Spolter to the numerous [f]ederal judges was not conducted on a random blind assignment basis." *Id.* at 2.

Relying on Dr. Radulovic's conclusion, Mr. Spolter suggested,

---

5. Only the first thirteen pages of Ms. Bettis's Motion for Reconsideration appear at D.E. 156. The remainder of her brief is filed as D.E. 156–2. As explained, *supra* at note 2, the page numbers cited in this Report and Recommendation refer to the numbers imprinted by the CM/ECF system.

A "reasonable person" who is familiar with [the] statistical report . . ., who is also familiar with the history between the undersigned and Judge Zloch, can reasonably form the belief that instead of the computerized judge selection process randomly selecting one of the 24 Federal judges situated in South Florida, the court clerk's computer was programmed to divert at least some employment law cases filed by any attorney to Judge Zloch or the in-take clerk, as a result of having been so instructed, handpicked Judge Zloch to preside over the employment law case being handled by the clerk during the intake process. Recall, all five of the cases assigned to Judge Zloch, which the undersigned filed and which the statistical report has specifically cited (including this case), had been filed in the Fort Lauderdale courthouse in which Judge Zloch presides. This same reasonable person could objectively come to believe that Judge Zloch had intended to divert to himself employment discrimination lawsuits, regardless of which attorney filed them for purposes of dismissing cases having a cause of action which he disfavors, and after the undersigned through motions based on thoroughly documented research revealed Judge Zloch's non-mainstream political and religious beliefs which led to unfair and improper bias displayed in numerous rulings in numerous cases, Judge Zloch further engineered a scheme to divert to himself a number of the undersigned's newly filed employment law cases. . . . This same reasonable person can also come to hold the conviction that Judge Zloch intentionally avoided diverting all 15 cases filed by the undersigned to himself, by instead diverting instead "just" many of them (one-third, in actuality) to enhance the strength of a defense against a potential claim of misconduct, should someone uncover the actions which have been described in this pleading. . . .

*Id.* at 7–12. Mr. Spolter further opined that "a reasonable person can believe that Judge Zloch has a political and religious bias against plaintiffs in employment cases, which motivated him to staff his chambers with like-minded 'zealots' as Clerks and these same far from 'mainstream' beliefs motivated Judge Zloch to subvert the random/blind process by which trial court judges are to be assigned to newly filed trial court level cases." *Id.* at 16. In support of this assertion, Mr. Spolter relied on many of the same arguments he had previously made to the Eleventh Circuit in seeking reassignment of the case upon remand to a judge other than Judge Zloch, and the Eleventh Circuit had rejected, concluding that although no appearance of impropriety existed, Mr. Spolter was "attempting to create an appearance of impropriety to further [Ms. Bettis's] request for recusal and reassignment." *Compare* D.E. 156–2 at 14–16, D.E. 156–5 at 21–23, and D.E. 156–6 at 1–20 *and* D.E. 135 at 819–20.

Two days after filing her Motion for Reconsideration of Order Granting Summary Judgment and Judgment [D.E. 156], Ms. Bettis, through Mr. Spolter, filed a motion to permit the motion for reconsideration she had already filed to exceed the page limitation set forth by the Local Rules of the Southern District of Florida. *See* D.E. 158. Judge Zloch granted the motion to exceed the page limitation. *See* D.E. 159.

On May 14, 2009, Toys "R" Us filed its opposition to Ms. Bettis's Motion for Reconsideration. *See* D.E. 163. In contesting the basis for recusal and disqualification of Judge Zloch raised by Mr. Spolter, Toys "R" Us described the grounds as "frivolous and legally insufficient," objecting that Mr. Spolter "fail[ed] to produce

one iota of admissible evidence" regarding Mr. Spolter's speculation that Judge Zloch had somehow caused the case assignment system to be "rigged," and describing Mr. Spolter's arguments as "consisting entirely of unsubstantiated innuendo." *Id.* at 17, 22. Thus, Toys "R" Us informed the Court, "Subsequent to filing [the Motion for Reconsideration], [Mr. Spolter] was put on notice of the proper standard for a motion for reconsideration, but chose to continue his pursuit of the motion rather than to withdraw it. As such, [Toys "R" Us] asks that the Court award Defendant its attorneys' fees incurred in responding to this frivolous motion." *Id.* at 23.

Mr. Spolter filed a reply brief on behalf of Ms. Bettis. *See* D.E. 170. In the reply, Mr. Spolter continued to assert that "the Court's failure to disqualify himself supports reconsideration based on ... all of the matters raised." *Id.* at 3. He further reasoned that because Toys "R" Us presented no expert of its own to contest Dr. Radulovic's findings, "Defendant's argument is conclusory and insufficiently rebutted." *Id.* at 12. Finally, Mr. Spolter included in the reply brief responses from Dr. Radulovic to additional questions submitted by Mr. Spolter. *See id.* at 13–15. Among other statements, Dr. Radulovic explained,

> There is no way for me to know if Judge Zloch had a lighter caseload th[a]n other judges. However, if Judge Zloch did have a lighter caseload th[a]n other judges (perhaps because he had other duties while serving as Chief Judge), then his having a lighter caseload makes it even more unlikely that he would have been assigned so many of Mr. Spolter's cases, in particular because Judge Zloch served as Chief Judge from July 1, 2000 through June 30, 2007 ... which overlaps the 2006 through 2009 period for

which we observe the unusual frequencies.

*Id.* at 13.

Upon completion of the briefing by the parties of Ms. Bettis's Motion for Reconsideration, Judge Zloch entered an Order of Referral to me. *See* D.E. 173. In this Order of Referral, Judge Zloch stated, "The Court recognizes that it is not required to hold an evidentiary hearing on these claims; however, in order to fully develop the record in these cases, to ensure the Parties' and the public's confidence in an honest and independent judiciary, and to determine the truth of the matters at issue, an evidentiary hearing is to be held ...." *Id.* at 2. To accomplish these purposes, Judge Zloch directed me "to hold an evidentiary hearing for the *sole and limited* purpose of determining the veracity of the allegations made by [Mr. Spolter] concerning [Judge Zloch's] manipulation of the blind, random assignment of cases in the Southern District of Florida ...," and to prepare a report and recommendation concerning my findings. *Id.* at 3 (emphasis in original). In particular, the report and recommendation is to

> make specific findings, aside from any other findings ... necessary to make, concerning the following specific questions:
>
> a. whether [the Motion for Reconsideration and similar motions filed in *Sabatier, Gossard,* and *Paul*] were presented for an improper purpose;
>
> b. whether a reasonable attorney in like circumstances could believe Plaintiffs' claims that [Judge Zloch] has manipulated the blind, random case assignment system in the Southern District of Florida were factually and legally justified;
>
> c. whether [Judge Zloch] has in any way manipulated the case assignment

system in the Southern District of Florida generally;

d. whether [Judge Zloch] has in any way manipulated the case assignment system in the Southern District of Florida specifically concerning cases filed by . . . Mr. Loring Spolter, Esq.; and

e. whether [Judge Zloch] has ever directed any individual in the Clerk's office to manipulate the case assignment system generally or with respect to cases filed by Mr. Spolter.

*Id.* at 3–4. With respect to the evidentiary hearing, Judge Zloch instructed the Clerk of the Court

to make available to testify at the evidentiary hearing the Clerk's office personnel (1) who [Mr. Spolter wishes to call to testify at the hearing], (2) who have any personal knowledge of the facts relevant to [Mr. Spolter's] claims, (3) who have any involvement in the case assignment system from the standpoint of operation, maintenance, and intake, and (4) who were involved in the filing of any of the Complaints filed by [Mr. Spolter] that were assigned to [Judge Zloch]. . . .

*Id.* at 5. He further ordered the Clerk of Court to prepare and serve upon Mr. Spolter for use at the hearing and introduction into evidence "reports of (1) all cases filed by Mr. Spolter in the Southern District of Florida for the last ten (1) years, including how and to whom they were assigned, (2) the fifteen cases referred to in Dr. Radulovic's report . . ., including how and to whom they were assigned, and (3) the five cases cited [most recently assigned to

Judge Zloch], including how they were assigned." *Id.* at 5–6.

In accordance with the Order of Referral, on June 24, 2009, I held an evidentiary hearing on the Motion for Reconsideration, as well as on the similar motions pending in *Sabatier, Gossard,* and *Paul.* The events leading up to the hearing and the proceedings at the hearing are described as Sections II.E and F below.

### B. Sabatier v. SunTrust Bank, Case No. 06–20418–CIV–ZLOCH ("Sabatier")

Mr. Spolter filed *Sabatier* on February 17, 2006. D.E. 1.[6] Ramon Sabatier, the plaintiff in the case, had been employed by SunTrust Bank from approximately 1985 through April 7, 2005, when he was fired. D.E. 17 at ¶¶ 11–58. In the Amended Complaint [D.E. 17], Mr. Sabatier alleged that SunTrust Bank had retaliated against him for complaining about SunTrust's subsequently admitted overtime pay violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), in violation of both the FLSA and the Florida Whistleblower's Act, Fla. Stat. §§ 448.101, *et seq.*[7] *See* D.E. 17.

During the course of the litigation, SunTrust filed its Motion for Summary Judgment. [D.E. 22]. After the motion was fully briefed, Judge Zloch entered an Order denying it on April 18, 2007. [D.E. 55]. As the Order explained, the Court found that genuine issues of material fact continued to exist warranting denial of the motion. *Id.* at 9. More specifically, Judge Zloch concluded that many of the significant facts submitted by SunTrust were not

---

**6.** In this subsection, all references to the docket are to the *Sabatier* docket unless otherwise specifically indicated.

**7.** Although the count regarding the Whistleblower's Act also alleged retaliation for ob-

jecting to gender discrimination, Sabatier withdrew that aspect of the claim prior to resolution of SunTrust's Motion for Summary Judgment. *See* D.E. 36.

supported by evidence of record. *Id.* In further elaborating on this deficiency, Judge Zloch stated that SunTrust impermissibly relied on an affidavit submitted by its district manager that contained hearsay, which a court may not consider when ruling upon a motion for summary judgment. *Id.* at 10 (citing *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999); 10B Wright, Miller, & Kane, *Federal Practice and Procedure: Civil 3d* § 2738 (West 1998, West Supp.2006); Fed. R.Civ.P. 56(c)). In the absence of consideration of the affidavit, the Court reasoned, SunTrust had failed to meet its burden to demonstrate facts sufficient to justify the granting of summary judgment. *Id.* at 11.

SunTrust then filed its Motion for Reconsideration of the Order Denying SunTrust's Motion for Summary Judgment. [D.E. 56]. Among other points, SunTrust argued that it did not submit the hearsay aspects of the district manager's affidavit for the truth of the matters asserted therein, but rather, to demonstrate the district manager's state of mind at the time that she was involved in the decision to terminate Mr. Sabatier's employment. *See id.*

After Mr. Sabatier timely filed his Opposition to SunTrust's Motion for Reconsideration [D.E. 57], on July 11, 2007, Mr. Spolter subsequently filed a document entitled, "Sworn Affidavit by Plaintiff's Counsel for Recusal of Trial Judge" [D.E. 59]. In this filing Mr. Spolter attested,

> The undersigned has a well-reasoned rational and legitimate concern that this Court will not utilize an impartial, fair, evenhanded or equitable basis when ruling on the Defendant's Motion for Reconsideration of the Court's Order on Defendant's Motion on Summary Judgment pending in the *Sabatier* matter, as a result of: 1) the Court's past conduct in [*Bettis*]; 2) The strongly held inextricably intertwined extreme religious and political beliefs of the same tr[ia]l judge overseeing both *Bettis* and *Sabatier;* 3) that even greater animus will be directed toward the Plaintiff (and/or [Mr. Spolter]) once the Court becomes aware of the contents of this Affidavit; and 4) when the Court becomes aware of the basis of the appeal in the *Bettis* case, with the brief in that case to closely track the contents of this Affidavit.

*Id.* at 1–2. As in the *Bettis* appeal, Mr. Spolter asserted that because of what Mr. Spolter described as Judge Zloch's bias or the mere appearance of bias against employment actions in light of Judge Zloch's purported connections to a conservative, Christian law school and other conservative organizations, Judge Zloch should recuse and disqualify himself from further proceedings in *Sabatier. See id.* at 11–21.

On July 17, 2007, Judge Zloch denied the motion for recusal contained in Mr. Spolter's affidavit. [D.E. 61]. He elaborated,

> The Court fails to see how [any] of the matters raised in the *Bettis v. Toys "R" Us,* 06–60334–CV–Zloch/Snow, apply to the above-styled cause. In *Bettis* the Court simply enforced the terms and conditions of its own Orders and the Local Rules of the United States District Court for the Southern District of Florida in dismissing the action for failure of Plaintiff to file her pre-trial stipulations by the prescribed time. With respect to the remaining issues raised in the instant Affidavit [D.E. 59], the Court finds them to be without merit.

*Id.*

On January 4, 2008, Judge Zloch granted SunTrust's Motion for Reconsideration. [D.E. 69]. As the Court explained, it had based its denial of SunTrust's Motion for Summary Judgment, in significant part, on its decision not to rely upon the affidavit of the district manager because it contained

hearsay. *Id.* Upon consideration of Sun-Trust's argument that the apparently hearsay aspects of the district manager's affidavit were submitted not for the truth of the matters asserted therein, but rather, to show the district manager's state of mind as to why she recommended termination of Mr. Sabatier's employment, the Court agreed with SunTrust's contention that the Court should have considered the district manager's affidavit in resolving SunTrust's Motion for Summary Judgment. *See id.* Thus, in a 35–page decision, the Court granted SunTrust's Motion for Reconsideration and SunTrust's Motion for Summary Judgment. *See id.*

Mr. Spolter appealed to the Eleventh Circuit Court of Appeals on behalf of Mr. Sabatier. *See* D.E. 71, D.E. 72, D.E. 77–79. On appeal Mr. Spolter identified four issues: (1) whether the district court abused its discretion in granting Sun-Trust's Motion for Reconsideration; (2) whether the district court erred in granting SunTrust's Motion for Summary Judgment; (3) whether the district court abused its discretion in denying as moot Mr. Sabatier's Motion to Reopen Discovery; and (4) whether the district court abused its discretion in denying the Motion for Recusal. D.E. 80 at 915. On January 13, 2009, the Eleventh Circuit affirmed Judge Zloch's rulings, stating, in relevant part,

> After reviewing the record and reading the parties' briefs, we first conclude that the district court correctly granted reconsideration of its order denying summary judgment because it earlier committed legal error in refusing to consider the affidavit of [the] decision-maker ..., [the district manager,]which was proffered by [SunTrust] to establish [Sun-Trust's] non-retaliatory reasons for the adverse employment actions at issue.
>
> Second, we conclude from the record that the district court correctly granted [SunTrust's] motion for summary judg-

ment. There were no genuine issues of material fact. Also, there was no error committed in relying on the testimony of interested witnesses ( [SunTrust's] employees) in granting summary judgment.

> Third, even if we assume, arguendo, that Sabatier did establish a prima facie case, he still cannot prevail because [Sun-Trust] presented legitimate, nonretaliatory reasons for the employment actions taken, and Sabatier failed to demonstrate that those actions were merely a pretext for discrimination.
>
> Finally, we see no abuse of discretion in denying Sabatier's motion to reopen discovery to take the deposition of his former supervisor.... We also see no abuse of discretion in the district court's decision to deny Sabatier's motion to recuse....

D.E. 80 at 915.

After the mandate issued from the Eleventh Circuit, on behalf of Mr. Sabatier, Mr. Spolter filed Plaintiff's Motion for Fed.R.Civ.P. 60(b)(6) Relief [and] Disqualification [D.E. 81] on June 8, 2009. This motion, which is currently pending before the Court, seeks

> relief from the Final Judgment [D.E. 70], the Order Granting [D.E. 69] Defendant's Motion for Reconsideration and Defendant's Motion for Summary Judgment, the denial [D.E. 70] of the Motion to Reopen Discovery to Permit Taking of Deposition of Former Direct Supervisor, and the denial [D.E. 61] of the Motion for Recusal. Further, [Mr. Sabatier] moves to disqualify District Court Judge William J. Zloch.

*Id.* at 1. This document contains the same contentions as Ms. Bettis's Motion for Reconsideration [*Bettis* : D.E. 156] in *Bettis* as the *Bettis* Motion for Reconsideration sought recusal and disqualification of Judge Zloch.

On June 12, 2009, in the same Order of Referral entered in *Bettis,* Judge Zloch referred to me for an evidentiary hearing regarding the same issues as in *Bettis,* Mr. Sabatier's Motion for Rule 60(b)(6) Relief and Disqualification. [D.E. 82]. SunTrust Bank subsequently filed an opposition to Mr. Sabatier's Motion for Rule 60(b)(6) Relief and Disqualification. *See* D.E. 89. In its response, SunTrust revealed,

> Prior to filing the instant Motion, [Mr. Spolter] contacted SunTrust's counsel about the filing of the Motion. SunTrust's counsel informed [Mr. Spolter] that there was not legitimate basis for filing the Motion, and that SunTrust would seek sanctions against [Mr. Sabatier and Mr. Spolter] if the Motion was filed. . . . In light of this, SunTrust seeks an award of reasonable attorney's fees and costs for the preparation of this response and any proceeding associated with [Mr. Sabatier's] Motion against [Mr. Sabatier] and/or [Mr. Spolter] pursuant to Rule 11, Federal Rules of Civil Procedure and 28 U.S.C. Section 1927.

*Id.* at 1–2. As support for its position, SunTrust attached a copy of a letter dated April 17, 2009, from its counsel to Mr. Spolter. *See* D.E. 89–2. The letter reads, in relevant part,

> SunTrust's position regarding your Motion to Vacate Judgment is that the continuing expressions of your prejudices towards and vendetta against Judge Zloch are highly inappropriate. The Eleventh Circuit Court of Appeals has already dismissed your claims against Judge Zloch as they pertain to the above-referenced matter. There is no legitimate reason why you need to drag SunTrust into your personal dispute any further.

> Should you move forward with your Motion to Vacate Judgment, we will seek sanctions against both you and Mr. Sabatier. . . .

*Id.*

As noted previously, on June 24 and July 2, 2009, the Court held evidentiary hearings in accordance with the June 12, 2009, Order of Referral. Those proceedings and the events occurring between the entry of the Order of Referral and the evidentiary hearings are discussed below in more detail. *See infra* at Sections II.E and II.F.

### C. *Sonya Gossard v. JP Morgan Case & Co., Case No. 08–60565–CIV–ZLOCH ("Gossard")*

Mr. Spolter originally filed *Gossard* on January 24, 2008, as Case No. 08–60107–CIV–ZLOCH. *See* Case No. 08–60107–CIV–ZLOCH, D.E. 1. Shortly thereafter, on February 21, 2008, however, Mr. Spolter filed a notice of voluntary dismissal, and the following day, Judge Zloch accordingly entered an order dismissing the case. *See id.* at D.E. 3, D.E. 4.

Also on February 21, 2008, the same date upon which Mr. Spolter filed the notice of voluntary dismissal in *Gossard* the first time it was pending before Judge Zloch, Mr. Spolter filed in the Circuit Court of the 17th Judicial Circuit in and for Broward County what is now Case No. 08–60565–CIV–ZLOCH currently pending before this Court, which contains essentially the same factual allegations as Case No. 08–60107.[8] *See* Case No. 08–60565–CIV–ZLOCH, D.E. 1 at 5.[9] Defendant JP Morgan Chase & Co., however, removed the matter to federal court, where it was assigned to the Honorable William P. Dimi-

---

8. Although both cases contain counts under the FCRA, the Complaint in Case No. 08–60107 also includes two Title VII counts.

9. In this subsection, all subsequent references to the docket are to the *Gossard* docket in the pending case (08–60565) unless otherwise specifically indicated.

trouleas. *See* D.E. 1 at 1. Based on Internal Operating Procedure ("IOP") 2.15.00(C),[10] Judge Dimitrouleas transferred the matter to Judge Zloch for all further proceedings. *See* D.E. 3.

In this case Plaintiff Sonya Gossard had been employed as an account executive at JP Morgan from April, 2005, through March 28, 2007, when she tendered her resignation under threat of being fired if she failed to resign. D.E. 1 at ¶¶ 13–25. In the Complaint [D.E. 1 at 5], Ms. Gossard alleged that her supervisor at JP Morgan had discriminated against her on the basis of gender and marital status, in violation of the FCRA, and, further, that JP Morgan had retaliated against Ms. Gossard for exercising her rights under the FCRA, also in violation of the FCRA. *See id.* at Counts I–III.

Following discovery, JP Morgan Chase & Co. moved for summary judgment. *See* D.E. 26. Ms. Gossard opposed the motion. *See* D.E. 31. Upon consideration of the motion, the Court granted summary judgment for JP Morgan Chase & Co. *See* D.E. 59. In so doing, the Court noted that pursuant to Local Rule 7.5, S.D. Fla., the Court viewed all material facts stated by JP Morgan Chase & Co. and supported by the record as admitted by Ms. Gossard, as Ms. Gossard had failed to comply with the Local Rules requiring her to set forth a single concise statement of the material facts for which she contended a genuine issue of fact existed to be tried, which

corresponded with the order and paragraph-numbering scheme employed by the movant. *See id.* As the Court explained,

> The Court wants to make plain that this ruling should not be looked at as a sanction against [Ms. Gossard or Mr. Spolter]. Because [Ms. Gossard] did not abide by Local Rule 7.5 regarding her Statement of Facts, by operation of the same Local Rule—and not by calculated choice of this Court—[JP Morgan Chase & Co.'s] uncontroverted facts are deemed admitted to the extent supported by the record.... The Eleventh Circuit has upheld this Rule. *Digioia v. H. Koch & Sons,* 944 F.2d 809, 811 n. 6 (11th Cir.1991) (upholding operation of former Local Rule 10.J.2, the predecessor to 7.5.D); *Calmaquip Eng'g W. Hemisphere Corp. v. W. Coast Carriers, Ltd.,* 650 F.2d 633, 636 (5th Cir. Unit B July.1981) (same)....

*Id.* at 3–4.

On April 2, 2009, Mr. Spolter filed Ms. Bettis's Motion for Reconsideration of Order Granting Summary Judgment and Judgment [D.E. 61]. In addition to challenging Judge Zloch's determination to deem admitted JP Morgan Chase & Co.'s statement material facts, as well as other substantive aspects of Judge Zloch's March 19, 2009, Order granting summary judgment, Mr. Spolter argued that the Order should be set aside because Judge Zloch "knew the circumstances gave rise to a reasonable inference of impropriety or

---

**10.** IOP 2.15.00(C) provides, "Whenever an action or proceeding is filed in the Court which involves subject matter which is a material part of the subject matter of another action or proceeding then pending before this Court, or for other reasons the disposition thereof would appear to entail the unnecessary duplication of judicial labor if heard by a different Judge, the Judges involved shall determine whether the newly filed action of proceeding shall be transferred to the Judge to whom the earlier filed action or proceeding

is assigned." Among other functions, this IOP acts to prevent any litigant from "judge-shopping" in a case such as this one, where the plaintiff dismissed the original version of the action after it was assigned to Judge Zloch and filed the current version in state court the same day. *See* Local Rule 3.4.C, S.D. Fla. Local Rule 3.4, S.D. Fla., reflects this same philosophy: "The assignment schedule shall be designed to prevent any litigant from choosing the Judge to whom an action or proceeding is to be assigned...."

lack of impartiality," and, therefore, he should have recused and disqualified himself from further proceedings in the case. *See id.* at 16. More specifically, Mr. Spolter based his contention on the argument that Judge Zloch had " 'a history' overseeing other employment law cases in which [Mr. Spolter] filed on behalf of Plaintiffs.... This 'history' included, but is not limited to, a Motion for Recusal of this same trial judge which the undersigned submitted on behalf of Plaintiff Ramon Sabatier, in *Sabatier v. SunTrust*, 06–20418–CIV–ZLOCH." *Id.* In addition, Mr. Spolter once again referred to work he commissioned Dr. Radulovic to perform (discussed *supra* at Section I.A.), arguing again that "[b]ased on the statistics and probability developed by Dr. Radulovic, an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal is sought would entertain a significant doubt about this Court's impartiality." *Id.* at 17–18. Mr. Spolter subsequently supplemented Ms. Gossard's Motion for Reconsideration with Dr. Radulovic's report. *See* D.E. 63.

JP Morgan Chase & Co. filed a brief in opposition to Ms. Gossard's Motion for Reconsideration. *See* D.E. 68. In addition to responding to the arguments advanced by Mr. Spolter on the merits, JP Morgan Chase & Co. briefly addressed Mr. Spolter's assertions regarding his position that Judge Zloch should have recused himself. *See id.* In this regard, JP Morgan Chase & Co. opined,

> Plaintiff's final argument that the judgment should be set aside because the honorable Judge presiding over this matter should have recused himself is nothing more than a red herring and sour grapes. Both parties have been held to the same standard in this litigation and have been admonished to comply with the Local Rules of this Court, as well as the Federal Rules of Civil Procedure. There is no evidence that the Court has been anything less than judicious and neutral to both parties. Plaintiff's argument is baseless and without merit and simply a thinly veiled attempt to trick this Court into second-guessing itself, based on his misplaced implications. JP Morgan will not spend any additional costs and expenses further responding to this disrespectful, whimsical, and baseless conspiracy theory by Plaintiff....

*Id.* at 10.

Subsequently, Mr. Spolter filed a motion for extension of time within which to file his reply in support of the Motion for Reconsideration. *See* D.E. 69. In explaining why he required additional time, Mr. Spolter reported that he "and his secretary miscommunicated as to how the secretary should process the response so that the reply would be timely prepared. As a result, the secretary did not process the response and preparation of the reply has not begun." *Id.* at 1. Judge Zloch granted Mr. Spolter's motion, extending the reply date for eleven days. *See* D.E. 70.

On May 11, 2009, Mr. Spolter filed Ms. Gossard's reply in support of her Motion for Summary Judgment. *See* D.E. 71. In this document, Mr. Spolter complained, "Other than in a cursory and conclusory fashion, the Defendant does not address the Plaintiff's argument that ... Judge Zloch manipulated the blind random assignment system (or a reasonable person can believe the judge has done so due to an impartial bias) entitling the Plaintiff to his disqualification and vacation of orders." *Id.* at 11–12.

On June 12, 2009, Judge Zloch entered the same Order of Referral for an evidentiary hearing in *Gossard* as he did in *Bettis* and *Sabatier*. [D.E. 72]. As noted previously, the evidentiary hearings occurred on June 24 and July 2, 2009, and

are discussed in Sections II.E and II.F of this Report and Recommendation.

### D. Paul v. D & B Tile of Hialeah, Inc., Case No. 09–60259–CIV–ZLOCH ("Paul")

Mr. Spolter filed this matter on February 18, 2009. *See* D.E. 1.[11] According to the Complaint, Laisner Paul was employed in various capacities by D & B Tile of Hialeah, Inc. ("D & B Tile"), from 1992 through until approximately 2008. *See id.* at ¶¶ 11–24. With respect to causes of action, the Complaint alleges a racially hostile work environment, as well as disparate treatment allegedly undertaken by D & B Tile because he is black and of Haitian descent, also in violation of 42 U.S.C. § 1981. *See id.* at Counts I and II. Finally, the Complaint asserts a cause of action based on D & B's alleged retaliation against Mr. Paul for his having opposed practices that he believed constituted unlawful anti-Haitian and anti-black discrimination, also in violation of 42 U.S.C. § 1981. *See id.* at Count III.

Before serving D & B Tile with the Complaint, however, Mr. Spolter filed Mr. Paul's Motion to Have District Court Judge William J. Zloch Disqualify Himself [D.E. 3]. This Motion makes the same arguments as the pending motions in *Bettis, Sabatier,* and *Gossard,* and again provides Dr. Radulovic's report as a supporting exhibit. *See id.*

On the same date that he filed the Motion to Have Judge Zloch Disqualify Himself [D.E. 3], Mr. Spolter also filed a motion for extension of time to make service of the suit upon D & B Tile. *See* D.E. 4. In explanation of the motion, Mr. Spolter

opined that "in light of [the Motion to Have Judge Zloch Disqualify Himself [D.E. 3]], [Mr. Spolter] believes that [Mr. Paul] will be prejudiced if any rulings are made by [Judge Zloch]." D.E. 4 at 1–2. Judge Zloch granted the motion, allowing Mr. Paul to have until June 23, 2009, to make service of his lawsuit upon D & B Tile. *See* D.E. 5.

On June 12, 2009, with regard to the Motion to Have Judge Zloch Disqualify Himself, Judge Zloch entered the same Order of Referral in *Paul* directing that I hold an evidentiary hearing as he had issued in *Bettis, Sabatier,* and *Gossard. See* D.E. 6. As in those cases, I held the specified evidentiary hearings on June 24 and July 2, 2009.

### E. The Events Preceding the June 24, 2009, Evidentiary Hearing

In accordance with Judge Zloch's directive in his Orders of Referral, D.E. 173,[12] on June 15, 2009, I set an evidentiary hearing for June 18, 2009, in the above-styled cases. D.E. 175. The following day, Mr. Spolter filed his Motion for Postponement of Court's June 18th Hearing to Provide Counsel With Reasonable Time to Draft and File Objections to Said Hearing [D.E. 177]. In this filing, Mr. Spolter objected to the holding of an evidentiary hearing as directed by Judge Zloch in the Orders of Referral. *See id.* He further explained that he required additional time to prepare his objections to what he described as the "ill-advised and unlawful" evidentiary hearing. *Id.* at 3. Consequently, Mr. Spolter requested at least twelve days from the entry of the June 12, 2009,

---

11. In this subsection, all references to the docket are to the *Paul* docket unless otherwise specifically indicated.

12. For ease of reference, where the same or similar filings were made in all four cases

before the Court, this Report and Recommendation cites only to the docket sheet in *Bettis*. Additionally, unless otherwise specifically noted, all subsequent docket sheet references in this Report and Recommendation shall be to the *Bettis* docket sheet.

Orders of Referral within which to file his objections. *Id.* at 5.

In deference to Mr. Spolter's request and in accordance with the Court's instruction to hold the evidentiary hearing no later than June 24, 2009, I reset the June 18, 2009, hearing for June 24, 2009. *See* D.E. 180. Although the Orders of Referral directed Mr. Spolter to file by June 19, 2009, a list of witnesses he desired to call from the Clerk's Office, *see* D.E. 173, Plaintiffs filed no such list. Accordingly, on June 21, 2009, the Court issued an Order directing the Clerk's Office to make available for testimony at the June 24th hearing various individuals that the Court viewed as possibly possessing information relevant to the alleged manipulation of the case assignment system. *See* D.E. 183.

On June 22, 2009, on behalf of Plaintiffs, Mr. Spolter filed a list of witnesses that he intended to call during the June 24, 2009, evidentiary hearing. *See* D.E. 184. The list included Dragan Radulovic, Ph.D., Mr. Spolter's expert statistician; Steven Larimore, Clerk of Court and Court Administrator for the United States District Court for the Southern District of Florida; the Honorable Federico Moreno, Chief Judge of the United States District Court for the Southern District of Florida; and the Honorable William J. Zloch, the judge presiding over the four cases before the Court. *See id.* That same day the I struck Judges Moreno and Zloch from Plaintiffs' Witness Lists, finding that witnesses from the Clerk's Office could provide any evidence Plaintiffs required regarding the matters in controversy, Judge Moreno had no identifiable unique, material knowledge about the issues, and Judge Zloch could not testify at a hearing regarding matters on which he may make the final findings of fact. *See* D.E. 185.

On June 23, 2009, Mr. Spolter filed Response and Objections of Counsel for All Named Plaintiffs to this Court's Order of June 12, 2009 [D.E. 188] and Plaintiffs' Supplement to Previously Filed Motions for Recusal or Disqualification of Trial Judge and/or to Vacate Prior Judgments [D.E. 189]. In his Objections, Mr. Spolter argued that Judge Zloch should not have referred the various recusal motions for an evidentiary hearing over which he retained ultimate authority. D.E. 188. He further complained that it was improper for Judge Zloch to require Mr. Spolter to present the witnesses specified in the Orders of Referral at the evidentiary hearing. *See id.*

As for Plaintiffs' Supplement [D.E. 189], Mr. Spolter again sought disqualification of Judge Zloch but this time alleged that Judge Zloch had improperly concealed information contained on his annual financial disclosure form. *See id.* For relief, Mr. Spolter sought to have Judge Zloch disqualified from presiding over any of the four cases at issue, as well as any cases in the future where Mr. Spolter represents a party, and to have all orders of dismissal vacated in the pending matters. *See id.*

Also on June 23, 2009, Mr. Spolter filed Plaintiffs' Motion to Reconsider Striking Witnesses From Plaintiffs' Witness List for Evidentiary Hearing [D.E. 191]. In this filing, Mr. Spolter asked the Court to reconsider its ruling striking Judges Moreno and Zloch from Plaintiffs' witness list for the evidentiary hearing. *Id.* As a basis, Mr. Spolter noted that the Court had stricken Judge Moreno in part because it could not identify any unique, material knowledge that he possessed. *Id.* In fact, however, Mr. Spolter correctly pointed out that Plaintiffs had never been required to identify the substance of the witnesses' expected testimony. *Id.* Describing the purpose of calling Judge Moreno as being to seek information from him regarding the case assignment system, as Judge Moreno had discussed in a *Daily Business Review* article regarding the four above-

styled cases, Mr. Spolter requested that the Court reverse its determination precluding Judge Moreno from testifying. *Id.* Mr. Spolter also asked the Court to revisit its decision making Judge Zloch unavailable as a witness at the evidentiary hearing. *Id.*

Later that same day the Court granted Plaintiffs' Motion to Reconsider Striking Witnesses but denied Plaintiffs' requests that they be permitted to present the testimony of Judges Moreno and Zloch at the evidentiary hearing. *See* D.E. 193. Also on June 23, 2009, Judge Zloch entered an order denying Plaintiffs' motion to vacate the June 12, 2009, Orders of Referral. *See* D.E. 194.

### F. The June 24 and July 2, 2009, Evidentiary Hearings

On June 24, 2009, the Court held an evidentiary hearing, as directed by Judge Zloch in the Orders of Referral. *See* D.E. 196. Mr. Spolter appeared at the hearing on behalf of all Plaintiffs, and the Clerk's Office, as well as Defendants Toys "R" Us, JP Morgan Case & Co., and SunTrust Bank were likewise represented by counsel at the hearing.[13]

At the outset of the evidentiary hearing, the Court explained that it was limiting the presentation of evidence at the hearing at that point to that relating to any irregularities in the case assignment system. Mr. Spolter once again stated his objections to the evidentiary hearing and again sought for the Court to allow Judges Moreno and Zloch to testify. *See* Transcript of June 24, 2009, Evidentiary Hearing ("6/24/09 Trans.") at 4–7. In so doing, Mr. Spolter asserted, "[M]y motion for recusal never said that I was specifically accusing Judge Zloch of anything. My specific motions for recusal pointed out statistical var-

iances that … can cause a reasonable person to question the impartiality of the court. Everything in my report was based on what a reasonable person could believe. I have never … said Judge Zloch did something wrong." *Id.* at 4.

Following Mr. Spolter's objections, the Court asked Spolter to present any evidence he might have regarding any alleged manipulation of the case assignment system. Mr. Spolter presented the testimony of Mr. Larimore and Dr. Radulovic.

At the conclusion of Mr. Spolter's presentation, the Court directed the Clerk's Office to present evidence regarding the case assignment system and how the four cases pending before the Court (as well as *Maurice v. West Broward Group, LLC,* Case No. 07–61576–CIV–ZLOCH, a fifth case identified by Mr. Spolter) came to be assigned to Judge Zloch. *See* 6/24/09 Trans. at 143. In accordance with the Court's request, the Clerk's Office presented the testimony of Lucy Lara, who had served until approximately 2004 as the case assignment administrator for the Clerk's Office. Ms. Lara's responsibilities as the case assignment administrator ended in approximately 2004, when Ed Sieber overtook the role. Mr. Sieber also testified, as did Kevin Kappes, the Chief Deputy of Court Administration for the Clerk's Office, who was involved in designing the computer program that the Clerk's Office began to use on May 1, 2003 (the "New System"), for the purpose of assigning cases to judges. Finally, the Clerk's Office presented Vernice Thomas, the intake clerk who received and assigned all of the cases filed by Mr. Spolter and randomly assigned to Judge Zloch since 2001. Defendants presented no evidence, although they participated in cross-examination.

---

**13.** D & B Tile was not represented by counsel, as it has not yet been served in the pending case.

Upon consideration of all of the evidence presented, as well as the record, the Court announced at the June 24th hearing that it found no evidence to support a finding that the case assignment system had been improperly manipulated or that Judge Zloch had somehow rigged the system or otherwise directed employment or labor cases, or cases filed by Mr. Spolter, to himself. Thus, the Court noted that it must proceed to the next areas of inquiry for which Judge Zloch had instructed the Court to make findings of fact—namely, whether Mr. Spolter had an improper purpose in filing his various recusal motions, and "whether a reasonable attorney in like circumstances could believe Plaintiffs' claims that [Judge Zloch] has manipulated the blind, random case assignment system in the Southern District of Florida were factually and legally justified." *See* D.E. 173 at 3.

In view of the late hour, the Court offered Mr. Spolter the choice of finishing the proceedings on June 24, 2009, or continuing them until July 2, 2009. Upon Mr. Spolter's statement that he preferred to continue the proceedings, the Court set the matter for the continuation of the hearing on July 2, 2009.

On July 2, 2009, the Court held the continuation of the evidentiary hearing. Once again, Mr. Spolter appeared on behalf of Plaintiffs, and the Clerk's Office, as well as Defendants Toys "R" Us, JP Morgan Chase & Co., and SunTrust were all represented by counsel. Mr. Spolter declined the opportunity to present additional evidence and instead argued that the evidence submitted during the June 24, 2009, hearing "clearly shows that the motions for recusal were filed for a proper purpose and that a reasonable attorney would have filed [the] motions for recusal." Transcript of July 2, 2009, Hearing ("7/2/09 Trans.") at 3. Additionally, Mr. Spolter directed the Court to his pleadings. *Id.* at 3–4.

Counsel for the Clerk's Office chose not to present argument. SunTrust, however, argued that the record establishes that Mr. Spolter's motions for recusal were filed for an improper purpose, and that a reasonable attorney in like circumstances would not view the recusal motions as factually and legally justified. Toys "R" Us and JP Morgan Chase & Co. joined in the argument of SunTrust, adding briefly to it.

Although the Court permitted Mr. Spolter an opportunity to respond, Mr. Spolter chose not to do so. 7/2/09 Trans. at 19. The Court then advised Mr. Spolter of its belief that it must follow *In re: Evergreen Security, Ltd.,* 570 F.3d 1257 (11th Cir. 2009), 2009 WL 1622386 (*"Evergreen"*), in considering whether the recusal motions were filed for an improper purpose and were factually and legally justified. *Id.* at 15–16. As the Court explained, among other considerations, the Eleventh Circuit looked to whether the filer of the motion made unreasonable assumptions and jumped to conclusions, whether the filer attempted to delay a hearing on the merits of the motion for recusal, whether the filer ignored decisions of other courts relating to reasons for the motion for recusal, whether the filer continued to pursue arguments that have already been rejected by the Court on multiple occasions, whether the filer made his allegations publicly, and whether the allegations were fantastic in nature. *Id.* In view of these factors, the Court asked Mr. Spolter whether he wished to make argument or present evidence directed specifically to any of these or any other considerations. *Id.* at 16.

Mr. Spolter replied that he believed that the record supports the finding that he filed the recusal motions for a "good-faith purpose" and that a reasonable attorney would have done the same thing. *Id.* at

16–17. According to Mr. Spolter, he filed the recusal motions because he "wanted to inform the "Court of what [he] found out and [he has] a duty to protect the interest of [his] clients based on [his] oath under the Florida Bar and [his] obligations to the Court." " *Id.* at 17. In further support of his actions, Mr. Spolter directed the Court to his recusal motions and subsequent filings.

The Court informed the parties that it would take the matters under consideration and issue its Report and Recommendation no later than July 10, 2009, as directed by Judge Zloch. These matters are now ripe for decision.

## II. Findings of Fact and Recommendations of Law

### A. The Case Assignment System in the Southern District of Florida

#### 1. Governing Rules and Policies

Local Rule 3.4, S.D. Fla.,[14] establishes the general policy directing the assignment of cases by the Clerk's Office to the several judges of the Southern District of Florida. In relevant part, Local Rule 3.4 provides as follows:

A. All civil and criminal cases, including those within a weighted category, shall be assigned on a blind random basis so that the District workload is fairly and equally distributed among the active Judges irrespective of jury division; provided that, whenever necessary in the interest of justice and expediency, the Court may modify the assignments made to active or senior Judges.

B. The Clerk of the Court shall not have any power or discretion in determining the Judge to whom any action or proceeding is assigned, the Clerk of the Court's duties being ministerial only. The method of assignment shall assure that the identity of the assigned Judge shall not be disclosed to the Clerk of the Court nor to any other person, until after filing.

C. The assignment schedule shall be designed to prevent any litigant from choosing the Judge to whom an action or proceeding is to be assigned, and all attorneys shall conscientiously refrain from attempting to vary this Local Rule.

\* \* \* \* \*

In accordance with the directive of Local Rule 3.4.A that "whenever necessary in the interest of justice and expediency, the Court may modify the assignments made to active or senior Judges," Internal Operating Procedure 2.00.00 sets forth additional considerations employed in executing the "blind random" assignment system described by Local Rule 3.4.A:

**IOP 2.00.00 *RANDOM ASSIGNMENT OF NEW CASES***

\* \* \* \* \* \*

**IOP 2.02.00 "One Division" Rule**

In the interest of reducing the expense and inconvenience to litigants and counsel associated with holding and attending court in distant locations, the Court will, to the extent possible, limit the assignment of cases outside of the division of their origination.[15] Although the distribution of

---

**14.** The Local Rules became effective February 15, 1993, and have been amended several times since then, including most recently, on April 15, 2009. *See* S.D. Fla. L.R. 1.1.B, and Comment to Local Rule 1.1, S.D. Fla. They govern "all proceedings [in the Southern District of Florida] in civil and criminal actions

except where indicated otherwise...." S.D. Fla. L.R. 1.1.C.

**15.** A case's "division of origination" can be determined by looking to its case number. The following numbers indicate the corresponding divisions of origination:

| Division | Numbers |
| --- | --- |

judges and filings across the District rules out a system in which each judge's caseload is equal and is composed entirely of cases originating in the division in which the judge sits, it is possible to limit case assignments to the originating division or an immediately contiguous division. Stated more simply, under this rule, when a newly-filed case must be assigned to a judge outside of the division of its origination, it will be assigned to a judge who sits in a neighboring division. Under this rule, hereafter referred to as the "one division rule," no Miami cases will be assigned to a judge who sits in the Palm Beach division, and vice versa. When, for example, there is a need to assign a Palm Beach case to a Judge outside that division, only Fort Lauderdale Judges will be chosen for assignment.

## IOP 2.02.01 Implementation of One Division Rule

The "One Division Rule" will commence with the first wheel replenishments occurring after January 1, 2002. Thereafter, every attempt will be made to assign the maximum numbers of cases arising in a particular venue to the judges who preside in that venue.

## IOP 2.02.02 Exceptions to the One Division Rule

The rule does not consider the Key West and Fort Pierce wheels, in which participation is voluntary, nor does it prohibit senior judges from taking assignments in any division they might prefer. Moreover, as an accommodation to the Court, active Judges may from time to time be authorized to accept new assignments in a manner

contrary to the rule. For example, Judge Middlebrooks is currently, as an accommodation to the Court, taking a fixed percentage of criminal cases originating in Miami, although he now presides in West Palm Beach. Finally, there may well be unanticipated emergencies which might require some limited two-division spillover assignment to maintain equality of caseload. The existence of an emergency sufficient to require varying from the rule, however, will be determined only by the Clerk in consultation with the Court.

## IOP 2.03.00 Calculation of Senior Judge Participation

Senior judge participation in the case assignment system shall be calculated as a percentage of an active judge's average.

\* \* \* \* \*

## IOP 2.07.00 Miscellaneous Transfers and Reassignments

Judges may confer and directly transfer all or any part of a case on the judge's docket to any consenting judge. Notice shall be provided to all parties.

\* \* \* \* \*

*See also* 6/24/09 Trans. at 14.

2. *Practical Implementation of the Governing Rules and Policies by the Clerk's Office*

To effectuate the random, blind assignment system prescribed by the Local Rules and the Internal Operating Procedures, the Clerk's Office used the "Old System" and, subsequently, the "New System." The Old System, an earlier version of the case assignment computer program, was in place until May 1, 2003, when it was

| | |
|---|---|
| Key West | 10001–13999 |
| Fort Pierce | 14001–19999 |
| Miami | 20001–59999 |
| Fort Lauderdale | 60001–79999 |

| | |
|---|---|
| West Palm Beach | 80001–89999 |

Admin. Order 2001–44, S.D. Fla. (Oct. 2, 2001) (available at www.flsd.uscourts.gov under the link, "Administrative Orders").

replaced by the New System. 6/24/09 Trans. at 153. Because the Old System caused "bunching," or assigning multiple consecutively numbered cases to a single judge, the New System employed a different methodology to avoid the problem. *Id.* at 152–53. Under the New System, the computer program maintains a "case counter" for each judge. *Id.* at 154. As the judges receive, transfer, or recuse from cases, their case counters adjust accordingly. *Id.* at 154–55. The New System is designed to assign cases in such a way as to try to equalize case distribution so that no judge receives any more case assignments than any other judge.[16] *Id.* Additionally, the New System, like the Old System, continues to factor into the case assignment process the location of origin of the case. *See id.* at 156.

Besides these considerations, the New System also takes into account other specific criteria. Among these criteria, the New System makes provisions for senior judges, who may elect to take only certain types of cases; the chief judge, who, similarly, may decide not to take particular categories of cases; and specific kinds of cases, such as *habeas corpus* cases, which are not assigned by the random case assignment process, but rather, are directed to the judge who presided over the original criminal action. 6/24/09 Trans. at 156–57. With regard to categories of cases a senior judge may elect not to receive, such judges may choose not to be assigned bankruptcy cases, emergency matters, Social Security cases, and other types of cases. *See* Government Exhibit ("GX") 7. No mechanism exists within the computer program of the New System for a judge to preclude himself or herself from assignment of labor or employment cases, or to direct that category of cases to a particular judge. *See id.; see also* 6/24/09 Trans. at 157.

The best way to describe the manner in which the New System works requires reference to GX 6, a composite of print-outs from the New System reflecting what happened to each of the four cases at issue, as well as to the fifth case Mr. Spolter filed that was assigned to Judge Zloch between 2006 and 2009. For ease of reference, the relevant aspects of the first page of GX 6, which shows how the computer system assigned *Sabatier,* are recreated below:[17]

---

**16.** The program does not account for a judge's contemporaneous workload. Thus, judges who work more quickly are not assigned more cases than their colleagues who may work more slowly. Instead, the program attempts to equalize the number of new cases assigned.

**17.** Because of space constraints and a lack of relevance to the matters at issue here, this chart omits the first column of GX 6, which contains the unique computer code for each district judge.

| [Judge] | [Case Counter] | Priority | Addi-tive | Adjusted [Case Counter] | 1st Pull | If neces-sary 2nd Pull | Random Pull |
|---|---|---|---|---|---|---|---|
| JLK | 1044.0806 | 1 | 0 | 1044.0806 | 1044.0806 | | |
| WMH | 1044.2196 | 1 | 0 | 1044.2196 | 1044.2196 | | |
| JCP | | 0 | | | | | |
| WJZ | 1041.3073 | 2 | 1 | 1042.3073 | | 1042.3073 | 1042.3073 |
| KLR | | 0 | | | | | |
| FAM | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| DLG | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| SH | 1049.9902 | 1 | 0 | 1049.9902 | 1049.9902 | | |
| KMM | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| UUB | 1048.0000 | 1 | 0 | 1048.0000 | 1048.0000 | | |
| DTKH | | 0 | | | | | |
| JAL | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| DMM | | 0 | | | | | |
| ASG | 1046.0000 | 1 | 0 | 1046.0000 | 1046.0000 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WPD | 1047.0000 | 2 | 1 | 1048.0000 | | 1048.0000 | |
| PAS | 1050.0000 | 1 | 0 | 1050.0000 | 1050.0000 | | |
| AJ | 1048.0000 | 1 | 0 | 1048.0000 | 1048.0000 | | |
| PCH | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| KAM | 1047.0000 | 2 | 1 | 1048.0000 | | 1048.0000 | |
| JEM | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| CMA | 1047.0000 | 1 | 0 | 1047.0000 | 1047.0000 | | |
| JIC | 1045.0000 | 2 | 1 | 1046.0000 | | 1046.0000 | |
| MGC | 1046.0000 | 1 | 0 | 1046.0000 | 1046.0000 | | |
| Minimum Counter: | | | | 1042.0000 Range 1042.0000 1043.0000 | 1044.0806 | 1042.3073 | |

GX 6 at 1 (emphasis added). In this chart, the first column ([Judge]) identifies by initials each judge receiving case assign-ments in the Southern District of Florida at the time that *Sabatier* was filed. The second column ([Case Counter]) shows

the case counter at the time that *Sabatier* was filed but before it was assigned to a particular judge, for each judge eligible to receive the *Sabatier* assignment.[18] *See* 6/24/09 Trans. at 164–70. For example, the case counter for Judge Zloch, represented by "WJZ," reflected "1041.3073" at the time that Mr. Spolter filed *Sabatier.* Because Mr. Spolter indicated on the case filing sheet that *Sabatier* originated in Miami–Dade County, Judges Payne, Ryskamp, Hurley, and Middlebrooks, all of whom sat in Palm Beach County at the time, were not eligible to be assigned *Sabatier* under the District's One Division Rule, which provides that cases shall not be assigned more than one division away from where they originated. *See* IOP 2.02.00. Consequently, their case counters do not appear in the second column.

The third column (Priority) can be filled by a 0, 1, or 2. 6/24/09 Trans. at 164–65. A "0" indicates that the judge is not eligible to receive the case being assigned. *Id.* This occurs, for example, when the judge sits in West Palm Beach but the action originates in Miami. *Id.* As discussed above, a judge sitting in West Palm Beach may not be assigned a case originating in Miami under the One Division Rule. *Id.* For a Miami case such as *Sabatier,* eligible judges sitting in Miami receive a "1" in the priority column, showing a preference to assign the case to such judges, again consistent with the One Division Rule. Meanwhile, judges sitting in Fort Lauderdale receive a "2" in the priority column because although the system is designed to prefer, if possible, a judge sitting in the place where the case originates, Fort Lauderdale still falls within one division of Miami, and, thus, judges in Fort Lauderdale are eligible to be assigned cases originating in Miami. *Id.*

The priority system works slightly differently for cases originating in Broward County and Palm Beach County. With regard to cases where the cause of action arises in Broward County, judges sitting in both Miami and Fort Lauderdale receive a priority of "1," and judges in West Palm Beach are designated a priority of "2" for such cases. 6/24/09 Trans. at 164; D.E. 204. As for cases originating in Palm Beach County, judges sitting in both West Palm Beach and Fort Lauderdale receive a priority of "1," whereas judges in Miami are assigned a priority of "0," rendering them ineligible to receive such assignments *Id.*

The fourth column (Additive) in the chart indicates the "additive." The "additive" constitutes one of the ways in which the computer system recognizes the preference to assign a case originating in a particular division to a judge sitting in that division, if possible. Under the "additive" column, each eligible judge receiving a priority of "2" receives a "1." 6/24/09 Trans. at 165. This "1" is added to these judges'

---

**18.** When the program counts the number of cases assigned to each judge, it designates a weight to each case assigned, depending on a judge's participation in the case assignment system. 6/24/09 Trans. at 169–70. All active judges, with the possible exception of the chief judge, have 100% caseloads. Consequently, when the computer program assigns a case to such an active judge, the computer program values the case at 1, and the case counter increases by one. *Id.* Because of his extra administrative duties, the chief judge has the option of taking less than a 100% caseload. Similarly, senior judges may elect to carry less than a 100% caseload. If a judge has a 50% caseload, for example, the program values the assignment of one case at 2, and the assigned judge's case counter increases by 2. *Id.* In this way the system accounts for caseload while still keeping the case counters as close together as possible. The case counter similarly assigns proportionate values to cases assigned to judges with other percentage caseloads, such as 60% or 75% caseloads.

case counters to arrive at a temporarily adjusted case counter that is reflected in the fifth column (Adjusted [Case Counter]). *Id.* As a result, for purposes of determining to whom the case should be assigned, the case counters of the judges receiving a priority of "2" temporarily increase by one, whereas the case counters of the eligible judges receiving a priority of "1" remain at their true counts.

Application of these principles to the *Sabatier* chart explains why Judges Zloch, Dimitrouleas, Marra, and Cohn, all of whom were sitting in Fort Lauderdale or West Palm Beach at the time that *Sabatier* was filed, each received an additive of "1" to their case counters. As a result of the additive, the temporarily adjusted case counters for Judges Zloch, Dimitrouleas, Marra, and Cohn each increased by one, whereas the case counters of the eligible Miami judges remained at their true levels.

At the bottom of the fifth column (Adjusted [Case Counter]), which reflects the eligible judges' case counters after consideration of the priority additives, the computer identifies the lowest temporarily adjusted case counter, rounded to the nearest one. 6/24/09 Trans. at 166. In the case of *Sabatier*, the lowest adjusted case counter totaled 1042.3073, which, when rounded to the nearest one, amounted to 1042. *Id.* Because the computer program is designed to attempt to equalize case assignments to the judges within one case of each other, the program then establishes a one-case range. *Id.* at 166–67. As GX 6 shows, in *Sabatier*, that range fell from 1042–1043 because 1042, or the lowest case counter, plus one more case, equals 1043. *See id.*

The sixth column (First Pull) pools all of the case counters for judges who have a "1" in the priority column. 6/24/09 Trans. at 167. At the bottom of the "first pull" column, the lowest case counter appears.

If it falls within the previously established range, the next step involves a random assignment, discussed later in this Report and Recommendation. If, on the other hand, none of the "priority 1" case counters (the case counters appearing in the "first pull" column) fall within the established range, the case assignment program conducts a second pull and pools the case counters of those judges with a priority of "2." *Id.* In the case of *Sabatier*, the first pull (or the pull of counters for Miami judges) resulted in a pool of case counters ranging from 1044 to 1050. *See* GX 6. Because the lowest case counter in this range is still higher than the 1042–1043 range established by the computer system at the step where it compared the judges' temporarily adjusted case counters, the computer system conducted a second pull (seventh column), which included only those judges with a "2" priority, or, in other words, the judges sitting in Fort Lauderdale at the time. As GX 6 demonstrates, in the second pull, Judge Zloch's temporarily adjusted case counter reflected a count of 1042.3073, while Judge Cohn, the judge with the next lowest case counter, had a count of 1046, which, again fell outside the 1042–1043 range established by the program for assigning *Sabatier*.

Finally, the last column of the chart (Random Pull) shows the pool of case counters falling within the determined range, or, in this case, 1042–1043. 6/24/09 Trans. at 168–69. From this pool of case counters, the computer system randomly selects the judge to whom the case shall be assigned. *Id.* In *Sabatier*, of all of the judges sitting in the Southern District of Florida at the time, only Judge Zloch's case counter fell within the established range. Thus, the system had to assign the case to him.

The remaining pages of GX 6 are comprised of print-outs from the case assign-

ment computer program for the other four cases filed by Mr. Spolter and assigned to Judge Zloch between 2006 and 2009. *See* GX 6. They show the trail of how Judge Zloch was assigned the cases.

### a. *Bettis v. Toys "R" Us,* Case No. 06–80334

*Bettis* originated in West Palm Beach. The relevant aspects of the print-out for how this case was assigned by the computer program appear below:

| [Judge] | [Case Counter] | Priority | Additive | Adjusted [Case Counter] | 1st Pull | If necessary 2nd Pull | Random Pull |
|---------|----------------|----------|----------|-------------------------|----------|-----------------------|-------------|
| JLK | | 0 | 0 | | | | |
| WMH | | 0 | 0 | | | | |
| JCP | 1092.3312 | 1 | 0 | 1092.3312 | 1092.3312 | | 1092.3312 |
| WJZ | 1091.9727 | 1 | 0 | 1091.9727 | 1091.9727 | | 1091.9727 |
| KLR | 1093.8371 | 1 | 0 | 1093.8371 | 1093.8371 | | |
| FAM | | 0 | 0 | | | | |
| DLG | | 0 | 0 | | | | |
| SH | | 0 | 0 | | | | |
| KMM | | 0 | 0 | | | | |
| UUB | | 0 | 0 | | | | |
| DTKH | 1094.0000 | 1 | 0 | 1094.0000 | 1094.0000 | | |
| JAL | | 0 | 0 | | | | |
| DMM | 1094.0000 | 1 | 0 | 1094.0000 | 1094.0000 | | |
| ASG | | 0 | 0 | | | | |
| WPD | 1094.0000 | 1 | 0 | 1094.0000 | 1094.0000 | | |
| PAS | | 0 | 0 | | | | |

| AJ | | 0 | 0 | | | | |
|---|---|---|---|---|---|---|---|
| PCH | | 0 | 0 | | | | |
| KAM | 1097.0000 | 1 | 0 | 1097.0000 | 1097.0000 | | |
| JEM | | 0 | 0 | | | | |
| CMA | | 0 | 0 | | | | |
| JIC | 1094.0000 | 1 | 0 | 1094.0000 | 1094.0000 | | |
| MGC | | 0 | 0 | | | | |
| Minimum Counter | | | | 1092.0000 Range 1092.0000 1093.0000 | 1091.9727 | NA | |

GX 6 at 2 (emphasis added). Because this case arose in West Palm Beach, the eligible pool of judges consisted of those sitting in West Palm Beach and Fort Lauderdale, all of whom received a priority rating of "1." Miami judges were not eligible for this assignment under the One Division Rule. Since no judges were assigned a priority of "2," there are no additives. Looking to the "adjusted case counter" column, the lowest case counter rounded to the nearest one totals 1092. Consequently, the range of case counters eligible for assignment of *Bettis* includes those falling between 1092 and 1093. Of the case counters in the "first pull" column, only those of Judges Zloch and Payne fall within the required range. Consequently, the computer made a random assignment of *Bettis* to Judge Zloch from the pool containing Judges Zloch and Payne.

**b.** ***Maurice v. West Broward Group, LLC, Case No. 07–61576***

*Maurice v. West Broward Group, LLC,* Case No. 07–61576, originated in Fort Lauderdale. The chart depicting the manner in which the computer program assigned the case to Judge Zloch follows:

| [Judge] | [Case Counter] | Priority | Addi-tive | Adjusted [Case Counter] | 1st Pull | If neces-sary 2nd Pull | Random Pull |
|---|---|---|---|---|---|---|---|
| JLK | | 0 | | | | | |
| WMH | | 0 | | | | | |
| JCP | | 0 | | | | | |
| WJZ | 1663.6284 | 1 | 0 | 1663.6284 | 1663.6284 | | 1663.6284 |
| KLR | | 0 | | | | | |
| FAM | 1665.3299 | 1 | 0 | 1665.3299 | 1665.3299 | | |
| DLG | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| SH | | 0 | | | | | |
| KMM | 1667.0000 | 1 | 0 | 1667.0000 | 1667.0000 | | |
| UUB | 1664.0000 | 1 | 0 | 1664.0000 | 1664.0000 | | 1664.0000 |
| DTKH | 1663.0000 | 2 | 1 | 1664.0000 | | | |
| JAL | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| DMM | 1664.0000 | 2 | 1 | 1665.0000 | | | |
| ASG | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| WPD | 1664.0000 | 1 | 0 | 1664.0000 | 1664.0000 | | 1664.0000 |
| PAS | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| AJ | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| PCH | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| KAM | 1665.0000 | 2 | 1 | 1666.0000 | | | |
| JEM | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| CMA | 1665.0000 | 1 | 0 | 1665.0000 | 1665.0000 | | |
| JIC | 1666.0000 | 1 | 0 | 1666.0000 | 1666.0000 | | 1663.0000 |
| MGC | 1663.0000 | 1 | 0 | 1663.0000 | 1663.0000 | | |

| Minimum Counter | | | 1663.0000 Range 1663.0000 1664.0000 | 1663.0000 | NA |
|---|---|---|---|---|---|

GX 6 at 3 (emphasis added). Because the cause of action in *Maurice* arose in Fort Lauderdale, Fort Lauderdale and Miami judges received a priority level of "1," and those sitting in West Palm Beach were assigned a priority rating of "2." After a

one was added to each of the West Palm Beach judges' case counters, the lowest temporarily adjusted case counter rounded to the nearest one was that of Judge Cooke's, with a level of 1663.0000. As a result, the eligible temporarily adjusted case counters ranged from 1663 to 1664. Of judges with a priority rating of "1," only the temporarily adjusted case counters of Judges Zloch, Ungaro, Dimitrouleas, and Cooke fell within the established range. When the computer performed a random selection, it chose Judge Zloch from this list of four jurists, and, thus, *Maurice* was assigned to Judge Zloch.

### c. *Gossard v. JP Morgan Chase & Co., Cases No. 08–60107 and 08–60565*

At the time that Mr. Spolter originally filed *Gossard,* which arose in Broward County, it was assigned Case No. 08–60107. Mr. Spolter, however, dismissed the matter without prejudice and filed a similar action in state court. JP Morgan Chase & Co. then removed the case to federal court, where it received Case No. 08–60565. Although Case No. 08–60565 was ultimately transferred to Judge Zloch because, as discussed previously, of its similarity to Case No. 08–60107, the case assignment system originally randomly assigned the matter to Judge Dimitrouleas. Below, the relevant portions of the printouts for each assignment of *Gossard* appear:

Case No. 08-60107

| [Judge] | [Case Counter] | Priority | Addi-tive | Adjusted [Case Counter] | 1st Pull | If neces-sary 2nd Pull | Random Pull |
|---|---|---|---|---|---|---|---|
| JLK | | 0 | | | | | |
| WMH | | 0 | | | | | |
| JCP | | 0 | | | | | |
| WJZ | 1748.6284 | 1 | 0 | 1748.6284 | 1748.6284 | | 1748.6284 |
| KLR | | 0 | | | | | |
| FAM | 1748.6625 | 1 | 0 | 1748.6625 | 1748.6625 | | 1748.6625 |
| DLG | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| SH | | 0 | | | | | |
| KMM | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| UUB | 1749.0000 | 1 | 0 | 1749.0000 | 1749.0000 | | 1749.0000 |
| DTKH | 1751.0000 | 2 | 1 | 1752.0000 | | | |
| JAL | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| DMM | 1751.0000 | 2 | 1 | 1752.0000 | | | |
| ASG | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| WPD | 1751.0000 | 1 | 0 | 1751.0000 | 1751.0000 | | |
| PAS | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| AJ | 1751.0000 | 1 | 0 | 1751.0000 | 1751.0000 | | |
| PCH | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| KAM | 1751.0000 | 2 | 1 | 1752.0000 | | | |
| JEM | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| CMA | 1749.0000 | 1 | 0 | 1749.0000 | 1749.0000 | | 1749.0000 |
| JIC | 1750.0000 | 1 | 0 | 1750.0000 | 1750.0000 | | 1750.0000 |
| MGC | 1749.0000 | 1 | 0 | 1749.0000 | 1749.0000 | | 1749.0000 |

| Minimum Counter: | 1749.0000 Range 1749.0000 1750.0000 | 1748.6284 | NA |
|---|---|---|---|

GX 6 at 4 (emphasis added). As with *Maurice*, *Gossard* also arose in Broward County. Accordingly, judges in both Fort Lauderdale and Miami received a priority of "1," whereas judges in West Palm Beach were assigned a priority of "2." After making temporary adjustments to the case counters of the West Palm Beach judges, the computer identified the lowest temporarily adjusted case counter rounded to the nearest one at 1749. As a result, the case counters eligible for assignment ranged from 1749 to 1750. While the case counters of thirteen judges with a priority of "1" fell within this range, the computer randomly selected Judge Zloch's case counter, and, thus, the computer assigned the first version of *Gossard* to Judge Zloch.

As for the removal of the state version of *Gossard* to this Court, the chart below shows how the case was assigned to Judge Dimitrouleas:[19]

**Case No. 08-60565**

| [Judge] | [Case Counter] | Priority | Addi- tive | Adjusted [Case Counter] | 1st Pull | If neces- sary 2nd Pull | Random Pull |
|---|---|---|---|---|---|---|---|
| JLK | | 0 | | | | | |
| WMH | | 0 | | | | | |
| JCP | | 0 | | | | | |
| WJZ | 1839.6284 | 1 | 0 | 1839.6284 | 1839.6284 | | 1839.6284 |

19. The Court notes that although this matter was technically filed by Defendant, as Defendant removed the case to federal court, Mr. Spolter still represented Plaintiff Gossard at the time of filing, and his name was on the state complaint that Defendant SunTrust removed to federal court. Thus, the case was identifiable as one of Mr. Spolter's cases.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KLR | | 0 | | | | | |
| FAM | 1840.6625 | 1 | 0 | 1840.6625 | 1840.6625 | | 1840.6625 |
| DLG | 1841.0000 | 1 | 0 | 1841.0000 | 1841.0000 | | 1841.0000 |
| SH | | 0 | | | | | |
| KMM | 1845.0000 | 1 | 0 | 1845.0000 | 1845.0000 | | |
| UUB | 1840.0000 | 1 | 0 | 1840.0000 | 1840.0000 | | 1840.0000 |
| DTKH | 1840.0000 | 2 | 1 | 1841.0000 | | | |
| JAL | 1841.0000 | 1 | 0 | 1841.0000 | 1841.0000 | | 1841.0000 |
| DMM | 1849.0000 | 2 | 1 | 1850.0000 | | | |
| ASG | 1842.0000 | 1 | 0 | 1842.0000 | 1842.0000 | | |
| WPD | 1840.0000 | 1 | 0 | 1840.0000 | 1840.0000 | | 1840.0000 |
| PAS | 1841.0000 | 1 | 0 | 1841.0000 | 1841.0000 | | 1841.0000 |
| AJ | 1842.0000 | 1 | 0 | 1842.0000 | 1842.0000 | | |
| PCH | 1841.0000 | 1 | 0 | 1841.0000 | 1841.0000 | | 1841.0000 |
| KAM | 1840.0000 | 2 | 1 | 1841.0000 | | | |
| JEM | 1842.0000 | 1 | 0 | 1842.0000 | 1842.0000 | | |
| CMA | 1840.0000 | 1 | 0 | 1840.0000 | 1840.0000 | | 1840.0000 |
| JIC | 1840.0000 | 1 | 0 | 1840.0000 | 1840.0000 | | 1840.0000 |
| MGC | 1889.0000 | 1 | 0 | 1889.0000 | 1889.0000 | | |
| Minimum Counter: | | | | 1840.0000 Range 1840.0000 1841.0000 | 1839.6284 | NA | |

GX 6 at 5 (emphasis added). As this chart shows, ten judges with a priority of "1," including Judge Dimitrouleas, had temporarily adjusted case counters falling within the eligible range of 1840–1841. From this pool of ten judges, the computer randomly selected Judge Dimitrouleas for assignment of the second filing of *Gossard*. Because of the similarity between Cases No. 08–60107 and 08–60565, Judge Dimitrouleas conferred with Judge Zloch and transferred Case No. 08–60565 to Judge Zloch in accordance with IOP 2.15.00(C). *See Gossard*, Case No. 08–60565, at D.E. 3.

### d. *Paul v. D & B Tile Co., Inc., Case No. 09–60259*

Like *Gossard* and *Maurice*, the cause of action in *Paul* also originated in Broward County. The chart below shows the manner in which the computer program assigned the case to Judge Zloch:

| [Judge] | [Case Counter] | Priority | Additive | Adjusted [Case Counter] | 1st Pull | If necessary 2nd Pull | Random Pull |
|---|---|---|---|---|---|---|---|
| JLK | | 0 | | | | | |
| WMH | | 0 | | | | | |
| JCP | | 0 | | | | | |
| WJZ | 2177.6284 | 1 | 0 | 2177.6284 | 2177.6284 | | 2177.6284 |
| KLR | | 0 | | | | | |
| FAM | 2177.6625 | 1 | 0 | 2177.6625 | 2177.6625 | | 2177.6625 |
| DLG | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| SH | | 0 | | | | | |
| KMM | 2182.0000 | 1 | 0 | 2182.0000 | | | |
| UUB | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| DTKH | 2176.0000 | 2 | 1 | | | | |
| JAL | 2179.0000 | 1 | 0 | 2179.0000 | | | |

| DMM | 2278.0000 [20] | 2 | 1 | | | | |
|---|---|---|---|---|---|---|---|
| ASG | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| WPD | 2178.0000 | 1 | 0 | 2178.0000 | 2178.0000 | | 2178.0000 |
| PAS | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| AJ | 2220.0000 | 1 | 0 | 2220.0000 | | | |
| PCH | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| KAM | 2177.0000 | 2 | 1 | | | | |
| JEM | 2180.0000 | 1 | 0 | 2180.0000 | | | |
| CMA | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| JIC | 2179.0000 | 1 | 0 | 2179.0000 | | | |
| MGC | 2178.0000 | 1 | 0 | 2178.0000 | 2178.0000 | | 2178.0000 |
| Minimum Counter: | | | | 2177.0000 Range 2177.0000 2178.0000 | 2177.6284 | NA | |

GX 6 at 6 (emphasis added). Because the cause of action occurred in Broward County, judges sitting in both Fort Lauderdale and Miami received a priority of "1," while judges in West Palm Beach were assigned a priority of "2." The lowest case counter rounded to the nearest one amounted to 2177, so the eligible case counters ranged from 2177 to 2188. This chart shows that from the group of priority "1" judges, the computer program identified four judges' temporarily adjusted case counters as falling within the eligible range of 2177–2178. From these four judges, the computer randomly selected Judge Zloch to receive assignment of *Paul.*

## B. *Evidence Presented by Mr. Spolter Regarding Any Manipulation of the Case Assignment System*

In accordance with Judge Zloch's directive, at the June 24, 2009, hearing, the Court provided Mr. Spolter with an opportunity to present any evidence he desired for the purpose of showing a basis for his assertions relating to alleged irregularities in the case assignment system, or, more specifically, that a reasonable person could

[1] form the belief that instead of the computerized judge selection process randomly selecting of the . . . Federal judges situated in South Florida, the court clerk's computer was programmed to divert at least some employment law cases filed by an attorney to Judge Zloch or the in-take clerk, as a result of having been so instructed, hand-picked Judge Zloch to preside over the employment law case being handled by the clerk during the intake process[;] . . .

[2] objectively come to believe that Judge Zloch had intended to divert to himself employment discrimination lawsuits, regardless of which attorney filed them, for purposes of dismissing cases having a cause of action which he disfavors[;] and

[3] [conclude that] after [Mr. Spolter] through motions based on thoroughly documented research revealed Judge Zloch's non-mainstream political and religious beliefs which led to unfair and improper bias displayed in numerous rulings numerous cases, Judge Zloch further engineered a scheme to divert to himself a number of [Mr. Spolter's] newly filed employment law cases.

*See* D.E. 156–2 at 11.

To establish a basis for his suggestions that a reasonable person could believe that the District's case assignment system had been manipulated, Mr. Spolter relied principally on Dragan Radulovic, Ph.D.[21] Over

**21.** Mr. Spolter also called Mr. Larimore as a witness. Mr. Larimore testified to the general manner in which the case assignment system works, as discussed previously in this Report and Recommendation. As nothing in Mr. Larimore's testimony even arguably provides

**1318**

no objection from the Clerk's Office or Defendants, the Court accepted Dr. Radulovic as an expert in statistics and probability. 6/24/09 Trans. at 55–56. Dr. Radulovic testified that he received a note dated March 11, 2009, from Mr. Spolter, which Mr. Spolter sent to Florida Atlantic University, seeking to retain an expert witness in probabilities or statistics. *Id.* at 59–60. As explained in the March 11th note, Mr. Spolter asked,

> Issue we wish to have analyzed/calculated:
>
> There are 24 Federal Judges in South Florida. Once a lawsuit is filed, there is supposed to be a blind random assignment to one of the 24 Federal judges. Our law firm seems to be assigned the same judge over an[d] over. We have filed eight (8) federal lawsuits on behalf of employment law clients during and after 2006. We have been assigned one judge in five (5) of these cases. We don't believe that this has been a random occurrence.
>
> Four judges are on "senior status" and are given fewer new cases th[a]n the other judges. All non-senior judges are supposed to have an equal chance of being assigned to a new case. In the absence of a special arrangement, what are the statistical odds that one specific judge would be assigned to 5 of the 8 new cases we [filed]—on a true random basis?
>
> We will pay an hourly fee for the calculation to be performed and for a brief report to be written explaining the basis of the calculation. If this type of analy-

sis is one which you will be interested in performing, please contact our law firm.

Plaintiffs' Exhibit ("PX") 3.

Based on this written request, Dr. Radulovic contacted Mr. Spolter regarding the project and agreed to perform the specified analysis at an hourly rate of $250.00. 6/24/09 Trans. at 56–60. After Mr. Spolter retained Dr. Radulovic, Mr. Spolter provided Dr. Radulovic with a listing from PACER of all 119 cases in which Mr. Spolter has appeared as counsel of record in the Southern District of Florida from 1994 through 2009.[22] *Id.* at 61–64; *see also* PX 4 at Ex. A. Dr. Radulovic then performed an analysis of the 119 cases filed between 1994 and 2009, noting the particular judge to whom each case was assigned. In conducting his study, Dr. Radulovic assumed at Mr. Spolter's direction that each active judge in the Southern District of Florida had an equal chance of being assigned any new case filed. *See* PX 3; 6/24/09 Trans. at 88. The analysis identified what Dr. Radulovic termed a "spike" to Judge Zloch between 2006 and 2009. During this three-year period, Mr. Spolter had appeared as counsel of record in fifteen cases. 6/24/09 Trans. at 61; *see also* PX 4 at Ex. A. Of these fifteen cases, five had been assigned to Judge Zloch, including the original filing of *Gossard,* as well as the other three above-styled matters and *Maurice.* Based on these results, Dr. Radulovic concluded with a certainty level in excess of 99% that a pure blind, random system was not used to assign the fifteen cases filed between 2006 and 2009. 6/24/09 Trans. at 65–66.

---

support for the idea that a reasonable person could believe that the case assignment system was rigged, the Court does not discuss it at this point. Instead, the Court notes some of the other more relevant aspects of Mr. Larimore's testimony later in this Report and Recommendation.

**22.** Although the report states that the cases were filed from 1996 through 2009, a review of Exhibit A to the report (the PACER list of cases) demonstrates that they were filed from 1994 through 2009.

Dr. Radulovic was correct. By "pure, blind, random" system, Dr. Radulovic was referring to a process whereby each judge would have had an equal chance of being assigned each case filed. *See* 6/24/09 Trans. at 66. That, however, does not accurately describe the case assignment system intended for, designed for, and used by the Southern District of Florida from 2003 through the present time, as Dr. Radulovic himself acknowledged after hearing the testimony of Mr. Larimore. *See id.* at 118.

Rather, by intention and design, the actual system used in the Southern District of Florida during this period employs a form of "supervised randomness." *Id.* at 65–66. "Supervised randomness" describes a system that is "basically random, [but] with additional configurations [and] preferences...." *Id.* at 66. As "supervised randomness" relates to the Southern District of Florida's case assignment system, the term contemplates consideration in the otherwise random assignment of cases of a variety of factors, such as criteria excluding certain judges from eligibility for assignment, the location where the case originated, the number of cases assigned to each eligible judge at the time that the new case is filed, and the preference for attempting to keep all judges' case counters within one of each other. Dr. Radulovic's analysis neither considered nor accounted for any of these factors. *See* 6/24/09 Trans. at 89–96, 120–22, 132–35; *see also* PX 3. As Dr. Radulovic conceded, "depending how much [of] a role it plays,

the [location where the case originates] would definitely make a difference. It could make [a] tremendous difference [in the analysis]." *Id.* at 112. Similarly, the number of cases a judge has already been assigned at the time of a new random assignment can significantly affect the assignment of a new case, as the program is designed to try to keep the judges' case counters within one of every other judge. When a judge receives a substantial number of transferred cases or direct assignments, such as in the case of *habeas corpus* matters, that judge's case counter may increase enormously, thereby reducing the pool of judges eligible to receive a new case assignment. *See supra* at n. 20.

Moreover, although fifteen cases may provide a statistically significant sample size when determining whether a pure, blind, random system of assignment is in place, Dr. Radulovic conceded that where such a system is not being used, "fifteen [would] be [a] fairly small number of data points," 6/24/09 Trans. at 106, and he did not have enough information to determine whether the sample size of fifteen would be statistically significant. *Id.* at 108. For all of these reasons, while the Court finds no reason to doubt Dr. Radulovic's math or his conclusion that he can be certain beyond a level of 99% that the Southern District of Florida does not employ a pure, blind, random system of case assignment, Dr. Radulovic's study provides no evidence for the suggestion that the Southern District of Florida's case assignment system has been rigged or otherwise improperly manipulated.[23] In short, Dr.

---

23. Even if the District relied on a pure, random, blind assignment system, it would be worth noting a few observations about the distribution of cases. First, when the entire fifteen-year span from 1994 through 2009 is considered, any alleged irregularities in a sliver of that period entirely dissolve. Indeed, a review of Mr. Spolter's list of 119 labor and employment cases in the Southern District of Florida during the period from 1994 through 2009, accounting for the number of years a

particular judge actually sat on the bench during that time and was, thus, eligible to receive cases, yields interesting results: Judge Zloch comes in fourth with .73 such cases per year assigned, behind Judges Cohn (1 case/year), Hurley (.93 cases/year) (two cases attributed to magistrate judges in Exhibit A were assigned by the system to Judge Hurley, and the parties later consented to magistrate judge jurisdiction), and Dimitrouleas (.91

Radulovic's report is irrelevant to the issue before the Court, as its value is limited to analyzing a system that under the Local Rules and Internal Operating Procedures of the Southern District of Florida does not and was never intended to exist in the Southern District of Florida during the period in question.

## C. Other Evidence Presented Relating to Any Alleged Manipulation of the Case Assignment System

In addition to Dr. Radulovic, several witnesses from the Clerk's Office testified at the June 24, 2009, hearing. Clerk of Court Steven Larimore explained that in the Southern District of Florida, the Court Clerk's computer system has the capability to allow a Clerk's Office employee to assign a case directly or randomly. *See* 6/24/09 Trans. at 26–27. While certain types of cases, such as *habeas corpus* cases are assigned directly to particular judges,[24] and the Clerk's Office may transfer cases among judges in accordance with duly issued Court orders,[25] new cases generally are assigned to judges via random assign-

ment. *See id.* In either case, however, the Clerk's Office employee facilitating the assignment of the case uses the computer system of the Clerk's Office to make the assignment. *Id.* The computer program, in turn, creates an audit trail for each assignment, documenting the employee filing the case and the type of assignment (random or direct). *Id.* When a random assignment is selected, the computer program considers information regarding the factors described above at Section III.A.2, such as the place where the case originated, and takes into account the number of cases assigned to each judge at the time that a new case is being assigned, trying to keep each judge's case assignment counter within one of each other judge's case counter. *See, generally,* 6/24/09 Trans. at 8–52. Mr. Larimore further testified that the Court approved the logic programmed into the District's case assignment computer system. *Id.* at 29–30, 34, 41.

With regard to the specific issue of manipulation of the case assignment system, Mr. Larimore emphatically denied any rigging or other manipulation of the system:

> [Mr. Spolter] once the Court becomes aware of the contents of [the affidavit filed by Mr. Spolter in *Sabatier* on July 11, 2007]; and 4) when the Court becomes aware of the basis of the appeal in ... *Bettis* ..., with the brief in that case to closely track the contents of [the *Sabatier*] Affidavit."

*Sabatier*, D.E. 59. Only three of Mr. Spolter's cases filed after the alleged triggering event in July, 2007, and before Mr. Spolter filed his recusal motions in 2009 were assigned to Judge Zloch.

24. *Habeas corpus* cases are assigned directly to the judge who presided over the petitioner's criminal case. 6/24/09 Trans. at 26.

25. An example of such a situation involves the second filing of *Gossard*, where the action fell to Judge Dimitrouleas, and he transferred it to Judge Zloch in accordance with the Internal Operating Procedures.

cases per year). Second, despite beginning his service as Chief Judge on July 1, 2000, and having been assigned six employment and labor cases filed by Mr. Spolter prior to that time, Judge Zloch did not receive an assignment of one of Mr. Spolter's cases while serving as Chief Judge for a period of more than five-and-one-half years, getting such an assignment for the first time only on February 21, 2006, approximately four-fifths of the way through his tenure. Third, the alleged triggering event for Judge Zloch's purported motivation affirmatively to seek out employment and labor cases, and, specifically, those of Mr. Spolter, did not occur until July 11, 2007, when Mr. Spolter first sought recusal of Judge Zloch because of

> "1) the Court's past conduct in [*Bettis*]; 2) The strongly held inextricably intertwined extreme religious and political beliefs of the same tr[ia]l judge overseeing both *Bettis* and *Sabatier*; 3) that even greater animus will be directed toward the Plaintiff and/or

Q: Mr. Larimore, did you ever instruct any member of the staff of the Clerk of the Court to direct a case assignment, a case assignment of Mr. Spolter to Judge Zloch?

A: Absolutely not.

Q: Did anyone in the court system ever tell you to direct an assignment of one of Mr. Spolter's cases to Judge Zloch?

A: Absolutely not.

Q: Did anyone ever instruct you to direct employment cases, the category of employment cases to Judge Zloch?

A: Absolutely not.

Q: Did you ever direct any of your staff members to assign, directly assign employment cases to Judge Zloch?

A: No.

6/24/09 Trans. at 45–46.

Besides Mr. Larimore, Clerk's Office employees Lucy Lara, Ed Sieber, Kevin Kappes, and Vernice Thomas also testified at the June 24th hearing. Ms. Lara served as the case assignment administrator until 2004, and Mr. Sieber took on the position thereafter. 6/24/09 Trans. at 144–45; 185. With respect to manipulation of the case assignment system, Ms. Lara testified,

Q: Ms. Lara, did you ever direct any employee of the Clerk's Office to directly assign Mr. Spolter's cases to Judge Zloch?

A: I had never even heard the name "Spolter" prior to being informed about this hearing.

Q: Did anyone in the court system ever instruct you to directly assign or to instruct others to directly assign employment or labor cases to Judge Zloch?

A: No.

*Id.* at 146–47. Mr. Sieber responded as follows to a similar set of questions:

Q: Mr. Sieber, has anyone ever instructed you to enter the case assignment system and change a random assignment to a direct assignment?

A: No.

\* \* \* \* \*

Q: ... [H]as anyone in the court system ever asked you, directed you, to take a case that was filed by Mr. Spolter as a new case and assign it directly to Judge Zloch?

A: No, only a transfer.

Q: Okay. And when it's a transfer, you need a court order?

A: That's correct.

Q: And the court order needs to be signed by whom?

A: By both judges.

Q: Did anyone in the court system ever instruct you to directly assign to Judge Zloch a disproportionate percentage of employment or labor cases?

A: No.

Q: Did you ever go into the system personally and take employment cases and assign those cases to Judge Zloch?

A: No.

*Id.* at 189–90.

As for Mr. Kappes, who holds the position of Chief Deputy of Court Administration, he testified that beginning in approximately 1994, he started working directly with the case assignment system. 6/24/09 Trans. at 151–52. In fact, Mr. Kappes was personally involved in designing the logic, or algorithm, of the case assignment system implemented by the District on May 1, 2003. *Id.* at 153. In discussing the types of information that must be input into the

computer system when a Clerk's Office employee assigns a case, Mr. Kappes noted that the system has no allowance for entering the fact that a case may involve a labor or employment action. *See id.* at 157–58. Mr. Kappes also walked the Court through each of the case assignment charts in GX 6, explaining how the New System assigns cases. 6/24/09 Trans. at 160–73. Then Mr. Kappes stated in response to questions from counsel for the Clerk's Office,

> Q: Mr. Kappes, has anyone ever instructed you to directly assign a case filed by Loring Spolter to Judge Zloch?
>
> A: No.
>
> Q: Have you ever of your own volition voluntarily directly assigned a case filed by Loring Spolter to Judge Zloch?
>
> A: No, I have not.
>
> Q: Have you ever instructed anyone to directly assign a case filed by Loring Spolter to Judge Zloch?
>
> A: No, I have not.

*Id.* at 174.

Vernice Thomas also testified. Ms. Thomas serves as an intake clerk in the Fort Lauderdale Clerk's Office. 6/24/09 Trans. at 198. The audit trails for each of the five cases (the four above-captioned cases, including the first iteration of *Gossard,* and *Maurice*) filed between 2006 and 2009 and assigned to Judge Zloch about which Mr. Spolter complains, indicate that Ms. Thomas served as the intake clerk. *See* GX 3. According to the audit trails, she randomly assigned all of these cases.[26] *See id.*

Although Ms. Thomas had no specific recollection of assigning the five cases in question, she explained the process she

always undertakes when receiving a new case for filing. *See* 6/24/09 Trans. at 199–206. As Ms. Thomas described, the computer system asks her whether an assignment is random, direct, or a recusal. *See* GX 8 at 2. If the intake clerk chooses "random assignment," the computer next asks for the venue where the case originated and any criteria applying to the case. *See id.* at 3. Ms. Thomas confirmed that employment or labor cases do not and have not in the past appeared among the criteria an intake clerk may select. 6/24/09 Trans. at 203–04. The computer program also contains a field for "remarks." *See* GX 8 at 6. In explaining the function of this field, Ms. Thomas stated that the intake clerk types in the style, or caption, of the case, such as *Renee Bettis v. Toys "R" Us. See* 6/24/09 Trans. at 204. She further testified that she would never enter the attorney's name in the "remarks" field. *Id.* After completing all of this requested information, the intake clerk clicks, "select a judge," and the computer program designates the case number and randomly assigns the case to an eligible judge. *Id.* at 205. According to Ms. Thomas, there is no way for an intake clerk to know to which judge a case will be assigned prior to pushing the "select a judge" button. *Id.*

With respect to the specific issue of manipulation of the case assignment system, Ms. Thomas testified as follows:

> Q: Ms. Thomas, has anyone ever instructed you to directly assign a case filed by Loring Spolter to Judge Zloch?
>
> A: No.
>
> Q: Has anyone ever instructed you to assign employment or labor cases to Judge Zloch directly?

Judge Dimitrouleas.

---

**26.** As previously noted, the second filing of *Gossard* was initially randomly assigned to

A: No.

\* \* \* \* \*

Q: ... Have you ever directly assigned a case filed by Loring Spolter to Judge Zloch yourself, a direct assignment?

A: No.

6/24/09 Trans. at 206. Mr. Spolter chose not to cross-examine her. *Id.* And, although Mr. Spolter questioned the other witnesses from the Clerk's Office, he did not impeach any of them or otherwise do anything to suggest that their testimony was anything other than truthful. *See, generally, id.* at 8–42, 50–52, 147–50, 174–84, 191–95. In addition, the Court found the testimony of all of the witnesses to be credible.

Thus, the unimpeached testimony of all of the Clerk's Office employees who were presented is that they never directly assigned any labor or employment cases, or any of Mr. Spolter's cases directly to Judge Zloch, with the exception of the second filing of *Gossard,* which was transferred to Judge Zloch by Judge Dimitrouleas in accordance with the Internal Operating Procedures. Nor did anyone ever ask any of them to assign labor or employment cases or cases filed by Mr. Spolter directly to Judge Zloch or otherwise request that they manipulate the blind, random case assignment system. So, in addition to the fact that Mr. Spolter presented no evidence tending to show an irregularity in the case assignment system, the Clerk's Office employees who implement the system and who actually assigned the cases at issue here affirmatively denied any manipulation of the case assignment program or any direction by Judge Zloch or anyone else to rig the system. Moreover, Mr. Kappes provided and thoroughly explained computer records showing how the New System made the case assignments for the five cases at issue consistent with the parameters programmed into the New System. Under these circumstances, the only findings supported by the evidence with respect to the last three questions asked by Judge Zloch in the Orders of Referral, *see* D.E. 173 at 3–4, are as follows:

 c. whether [Judge Zloch] has in any way manipulated the case assignment system in the Southern District of Florida generally;

 Finding: No, there is no evidence that Judge Zloch has in any way manipulated the case assignment system in the Southern District of Florida generally.

 d. whether [Judge Zloch] has in any way manipulated the case assignment system in the Southern district of Florida specifically concerning cases filed by Plaintiffs' Counsel Mr. Loring Spolter, Esq.;

 Finding: No, there is no evidence that Judge Zloch has in any way manipulated the case assignment system in the Southern District of Florida specifically concerning cases filed by Plaintiffs' Counsel Mr. Loring Spolter, Esq.

 e. whether [Judge Zloch] has ever directed any individual in the Clerk's office to manipulate the case assignment system generally or with respect to cases filed by Mr. Spolter.

 Finding: No, there is no evidence that Judge Zloch has ever directed any individual in the Clerk's office to manipulate the case assignment system generally or with respect to cases filed by Mr. Spolter.

**D.** *The Propriety of Filing the Recusal Motions at Issue*

Having found that no improper manipulation of the case assignment system actually ever occurred or was sought by Judge Zloch or anyone else, the Court proceeds

to Judge Zloch's remaining inquiries in the Orders of Referral: (1) whether a reasonable attorney in like circumstances to that of Mr. Spolter could believe that Plaintiffs' claims that a reasonable person could conclude that Judge Zloch manipulated the · blind, random case assignment system in the Southern District of Florida were factually and legally justified, and (2) whether the recusal motions at issue were presented for an improper purpose. *See* D.E. 173 at 3. Mr. Spolter objects that these inquiries constitute improper considerations when making the substantive determination as to whether a recusal motion should be granted. *See* D.E. 188 at 9. That, however, is not what Judge Zloch assigned me to do.

Rather, the standards contained in both of the inquiries that Judge Zloch has directed me to make are those found in the certification requirements of Rule 11, Fed. R.Civ.P., which require that every non-exempt written filing [27]—whether a recusal motion, a complaint, or some other type of filing—must be signed by at least one attorney of record (or, where a party proceeds *pro se,* by the party). In so do, the signing attorney certifies, in relevant part, as follows:

> (b) **Representations to the Court.** By presenting to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any *improper purpose,* such as to harass, cause unnecessary delay, or

needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are *warranted by existing law* or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the *factual contentions have evidentiary support* or, if specifically *so identified,* will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . .

Fed.R.Civ.P. 11(b) (emphasis added). Thus, Judge Zloch has not instructed me to make any determinations on the merits of the recusal motions. Instead, he has referred to me questions surrounding the propriety of filing of the recusal motions. Beginning with the third consideration, the Court examines each of these matters in turn.

### 1. The Factual Contentions

█ At this stage of the analysis, the Court considers only whether, after an "inquiry reasonable under the circumstances," a "reasonably competent attorney" in Mr. Spolter's position could have reached the conclusions suggested by Mr. Spolter in his motions for recusal, more specifically, that a "reasonable person" could have

> [1] form[ed] the belief that instead of the computerized judge selection process randomly selecting of the ... Federal judges situated in South Florida, the court clerk's computer was programmed to divert at least some employment law cases filed by an attorney to Judge

---

27. Rule 11(d) makes the provisions of Rule 11 inapplicable to "disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37." Fed.R.Civ.P. 11(d). Those documents are governed by the provisions contained within Rules 26 through 37. *See* Fed.R.Civ.P. 26–37.

Zloch or the in-take clerk, as a result of having been so instructed, handpicked Judge Zloch to preside over the employment law case being handled by the clerk during the intake process[;] ...

[2] objectively come to believe that Judge Zloch had intended to divert to himself employment discrimination lawsuits, regardless of which attorney filed them, for purposes of dismissing cases having a cause of action which he disfavors[;] and

[3] [concluded that] after [Mr. Spolter] through motions based on thoroughly documented research revealed Judge Zloch's non-mainstream political and religious beliefs which led to unfair and improper bias displayed in numerous rulings numerous cases, Judge Zloch further engineered a scheme to divert to himself a number of [Mr. Spolter's] newly filed employment law cases.

*See* Fed.R.Civ.P. 11(b); D.E. 156–2 at 11; *see also Ledford v. Peeples,* 568 F.3d 1258, 1312–13 (11th Cir.2009) (applying standard of a "reasonably competent attorney" under analysis of whether a factual contention had the evidentiary support required by Rule 11(b)(3)). Put simply, this inquiry seeks to determine whether a party's filings have a "reasonable factual basis" supporting them. *See Worldwide Primates, Inc. v. McGreal,* 87 F.3d 1252, 1254 (11th Cir.1996). In evaluating the sufficiency of the factual support, an attorney's good-faith belief that the claims were sound are irrelevant; only whether the attorney made a "reasonable inquiry" matters. *See id.*

Nevertheless, "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed.R.Civ.P. 11, Advisory Committee Notes to 1983 Amendment. With this thought in mind, courts should consider factors such as "how much time for investigation was available to the signer" and "whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper." *Id.; see also Worldwide Primates, Inc.,* 87 F.3d at 1254 (citing *Mike Ousley Productions, Inc. v. WJBF–TV,* 952 F.2d 380, 382 (11th Cir.1992) (quoting Advisory Committee Note to Rule 11, as amended in 1983)).

Here, as established above, no actual factual basis exists for the suggestions that the Southern District of Florida's case assignment system is rigged to assign disproportionate numbers of employment or labor cases, or cases filed by Mr. Spolter, to Judge Zloch. Consequently, the Court must consider whether Mr. Spolter made a reasonable inquiry before asserting that a reasonable person could come to the opposite conclusion.

In so doing, the Court retraces Mr. Spolter's steps. The record reflects that on February 23, 2009, Mr. Spolter sent a letter to Mr. Larimore, Judge Zloch, and Chief Judge Moreno making a Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), request. *See* GX 9 at 3–6; D.E. 188 at 9–10. Among other information, Mr. Spolter requested the following:

3. All written policies and/or rules and/or guidelines in effect during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases.

4. All written communications from any and all judges dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases.

5. All written communications from the Clerk of the Court dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on some and/or all newly filed cases.

6. All written policies and/or rules and/or guidelines in effect during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on newly filed cases for which county of occurrence effects and/or relates to said assignment(s).

7. All written communications from any and all judges dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on newly filed cases for which county of occurrence effects and/or relates to said assignment(s).

8. All written communications from the Clerk of the Court dated during calendar years 2005, 2006, 2007, 2008 and 2009 pertaining to assignment of judges on newly filed cases for which county of occurrence effects and/or relates to said assignment(s).

9. Any and all documents drafted and or generated during calendar years 2005, 2006, 2007, 2008, and 2009 stating and/or reflecting the number of civil cases assigned to specific judges.

10. Any and all documents drafted and or generated during calendar years 2005, 2006, 2007, 2008, and 2009 stating and/or reflecting the number of cases based on civil cause(s) of action assigned to specific judges, regardless [of] whether cases were newly filed and or previously filed.

16. All documents, including but not limited to directives, memos, memorandums, policies, guidelines and/or instructions indicating that any lawsuit filed by Attorney Loring Spolter should be assigned to any specific judge and/or should be treated for judge assignment purposes in a manner other than how cases are generally handled and/or assigned.

17. Other than lawsuits or other pleadings filed by litigants or orders which the Court has actually provided copies via PACER to Loring Spolter, provide all documents, including but not limited to directives, memos, memorandums, policies, guidelines and/or instructions mentioning, pertaining to, or otherwise naming or specifically relating/pertaining to attorney Loring Spolter.

24. All computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on any basis other than 100% randomness.

25. Pertaining to computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on any basis other than 100% randomness, produce all documents relating to which individual(s) requested the purchase, obtaining and/or use of same.

26. Pertaining to computer programs and/or similar formulas which were in your possession at any point in time during calendar years 2005, 2006, 2007, 2008 and 2009 relating and/or pertaining to assignment to judges of newly filed civil cases on

any basis other than 100% randomness, produce all documents relating to which individual(s) authorized the purchase, obtaining and/or use of same.

*Id.* The specific requests contained within Mr. Spolter's February 23, 2009, letter indicate that Mr. Spolter spent time carefully thinking about the types of information he might wish to consider in evaluating his hypothesis that a reasonable person might conclude that Judge Zloch had somehow improperly caused the Southern District's case assignment system to be "rigged" or otherwise improperly manipulated. The record cannot support a finding, however, that Mr. Spolter invested the same amount of energy in investigating the information contained in the response he received to his letter.

Mr. Larimore responded to Mr. Spolter's February 23, 2009, letter on March 6, 2009, on behalf of Chief Judge Moreno and on behalf of himself. *See* GX 9 at 1. After noting that the FOIA, by its terms, does not apply to the federal judiciary, Mr. Larimore stated that the Clerk's Office "nonetheless endeavor[s] to cooperate with requests for information where appropriate. If the information being sought is public, does not require the disclosure of confidential information, and is not overly burdensome, [the Clerk's Office] attempt[s] to respond consistent with the Subpoena Regulations adopted by the Judicial Conference of the United States Courts ...." *Id.* Mr. Larimore then grouped Mr. Spolter's inquiries into "general topics for ease of responding." *Id.* In pertinent part, Mr. Larimore replied,

> *Data re Individual Judge Assignments:* Concerning specific case assignments to individual Judges, you can research yourself through dockets on the CM/ECF/Pacer system the list of the court's cases per year along with the Judges assigned to those cases. The

Court does not release assignment data based upon individual assigned Judges.
* * * * *
> *Case Assignment Policies:* Procedures concerning the random assignment of cases are set forth in the Internal Operating Procedures 2.00.00–2.17.00 of the United States District Court for the Southern District of Florida, found at our website at www.flsd.uscourts.gov under the heading Rules. Any information about computer programs used for such purposes is not subject to disclosure in order to protect the integrity of the Court's automated systems. The Clerk's Office, which administers those policies, has at no time received any directive to treat assignment of cases filed by you any differently than we would treat the random assignment of cases filed by any other attorneys.
* * * * *

*Id.* at 1–2.

Review of this letter shows that out of a stated concern for the integrity of the Court's case assignment program, Mr. Larimore did not provide Mr. Spolter with the intricate details regarding the manner in which the District's case assignment system works. Nevertheless, he expressly stated that the Clerk's Office "at no time received any directive to treat assignment of cases filed by [Mr. Spolter] any differently than [the Clerk's Office] would treat the random assignment of cases filed by any other attorneys." GX 9 at 2. As a result, Mr. Larimore effectively fully answered Mr. Spolter's questions relating to instructions to treat cases filed by Mr. Spolter differently from cases filed by other attorneys and provided no basis for Mr. Spolter to believe that some type of direction to the Clerk's Office existed telling the Clerk's Office to handle Mr. Spolter's cases in a manner other than that applied to cases filed by every other lawyer.

More significantly, although Mr. Larimore's letter did not provide a detailed road map for Mr. Spolter to have followed to understand precisely how his cases were assigned, it did refer Mr. Spolter to IOP's 2.00.00–2.17.00 for more information and it further described for Mr. Spolter how he could access the IOP's on the District's public website. As previously discussed, these Internal Operating Procedures identify the policies driving the District's case assignment computer program. IOP's 2.02.00 and 2.02.01, for example, disclose the existence of the District's "One Division Rule." Under that rule, "every attempt will be made to assign the maximum numbers of cases arising in a particular venue to the judges who preside in that venue." IOP 2.02.01. Thus, Mr. Larimore's response should have caused a "reasonably competent attorney" to recognize that the District does not assign newly filed civil cases to judges on a "100% random[ ]" basis, as Mr. Spolter suggested he originally believed when he sent his February 23, 2009, letter. *See* GX 9 at 6. Indeed, it is fair to expect that a "reasonably competent attorney" in Mr. Spolter's shoes would have reviewed the IOP's before proceeding any further.

Instead, and despite this information provided by Mr. Larimore on March 6, 2009, five days later, on March 11, 2009, Mr. Spolter solicited the services of a statistician to "analyze[ ]/calculate[ ] . . . the statistical odds that one specific judge would be assigned to 5 of the [15] new cases [Mr. Spolter filed] on a true random basis." GX 3. In explaining the project, Mr. Spolter wrote, "All non-senior judges are supposed to have an equal chance of being assigned to a new case." *Id.* This statement, however, directly conflicts with the publicly stated policy of the IOP's that the case assignment system is designed to prefer to assign a case to a judge sitting in the division of that case's origin. Nor did

Mr. Spolter provide Dr. Radulovic with a copy of the IOP's. 6/24/09 Trans. at 87–90.

In view of these problems, the Court considers the time available to Mr. Spolter to have investigated his claims more thoroughly. As noted above, Mr. Larimore's letter is dated March 6, 2009. Nothing in the records of any of these four cases indicates any exigency requiring Mr. Spolter to file his recusal motions immediately after March 6th. To the contrary, the record reflects that Mr. Spolter did not file the first of his recusal motions based on the alleged manipulation of the case assignment system until approximately six weeks later, on April 27, 2009, when he filed Plaintiff's Motion for Reconsideration of Order Granting Summary Judgment and Judgment [D.E. 156] in *Bettis*. Consequently, no time pressure appears to have limited Mr. Spolter's ability to conduct a reasonable factual inquiry.

Mr. Spolter attempts to explain the deficiencies in his investigation by referring the Court to Local Rule 3.4, S.D. Fla., which has been set forth in Section II.A.1 above. More specifically, Mr. Spolter points to the statement within Local Rule 3.4.A that "[a]ll civil and criminal cases, including those within a weighted category, shall be assigned on a blind random basis so that the Division workload is fairly and equally distributed among the active Judges irrespective of jury division . . . ." *See* D.E. 188 at 11–13. Based on this pronouncement, Mr. Spolter argues that it was reasonable for him to have believed that the District would assign cases on a *pure* blind, random basis. *Id.*

The problem with this explanation, however, arises from the fact that it ignores both the remaining part of Local Rule 3.4.A, which states, "provided that, whenever necessary in the interest of justice and expediency, the Court may modify the assignments made to active or senior

Judges[,]" and the Internal Operating Procedures to which Mr. Larimore expressly referred Mr. Spolter. Consistent with Local Rule 3.4.A's stated concern for the "interest of justice and expediency," IOP 2.02.00 specifically identifies its purpose as being "[i]n the interest of reducing the expense and inconvenience to litigants and counsel associated with holding and attending court in distant locations" and then goes on to specify at IOP 2.02.01 that "every attempt will be made to assign the maximum numbers of cases arising in a particular venue to the judges who preside in that venue." In view of this explicit statement regarding the preference for assigning a case to a judge sitting in the division where the cause of action arose, it is clear that the reference in Local Rule 3.4.A to assigning cases in such a way that "the Division workload is fairly and equally distributed among the active Judges irrespective of jury division," refers to the fact that the District assigns judges sitting in each of the divisions roughly the same number of cases, regardless of whether the number of cases arising in each division per judge is the same. It does not suggest that every judge sitting in the District shares an equal chance of being assigned every case. Any other interpretation makes no sense, in view of the IOP's stated preference for assigning cases to judges sitting in the divisions where the cases arose.

Mr. Spolter also refers to Local Rule 3.4.B's prohibition on the Clerk's Office to have "any power or discretion in determining the Judge to whom any action or proceeding is assigned" as providing a

reasonable basis for his assertion that a reasonable person reviewing Dr. Radulovic's study could believe that the case assignment system was rigged. *See* D.E. 188 at 11–16. In this regard, the Court understands Mr. Spolter's contentions at the June 24th hearing to suggest that the input screens requesting information regarding criteria and venue equate to "power or discretion" for the Clerk's Office in assigning a case.[28] There is nothing discretionary, however, about a Clerk's Office employee inputting venue information provided by the filing attorney into the Court's computer system. Nor does entering criteria involve any judgment calls. Both tasks require the employee, at most, to input objectively determinable ministerial information so that the computer program may account for such facts when assigning a case. As with the reference to Local Rule 3.4.A, Mr. Spolter's invocation of Rule 3.4.B does not somehow render the IOP's inapplicable; to the contrary, nothing about the IOP's conflicts with Rule 3.4.B.

Next, Mr. Spolter takes issue with the preference system, arguing that it "[p]ermits and encourages attorneys to file cases in a way which influences which District Court Judge shall be assigned to the case, thus, encouraging an effective means of 'judge shopping.'" D.E. 188 at 13. Whether Mr. Spolter agrees with the manner in which the Court makes its case assignments or not, however, has no bearing on the issue of whether Mr. Spolter made a reasonable inquiry into the factual basis for his assertions that a reasonable

---

**28.** To the extent that Mr. Spolter could be understood to be suggesting that the ability of the Clerk's Office to assign cases directly to a judge involves discretion, the facts do not bear this out. As discussed previously, the Clerk's Office may direct a case to a particular judge only under very specific circumstances, such as assigning a *habeas corpus* matter to the judge who handled the original criminal matter, or transferring a case to a different judge pursuant to a Court order. No evidence suggests that the Clerk's Office can, of its own volition, direct or transfer a case to a particular judge simply because the employee handling the matter feels like it.

person could conclude that Judge Zloch had somehow caused the case assignment system to be "rigged," and it cannot absolve Mr. Spolter of his responsibility to conduct a reasonable inquiry into the basis of his contentions before filing them.

Furthermore, in view of the Clerk's direction of Mr. Spolter to the IOP's, as well as the fact that the IOP's have been available to anyone wishing to view them, at www.flsd.uscourts.gov, the public website of the United States District Court for the Southern District of Florida, since at least August 12, 2005,[29] Mr. Spolter's continued description of the case assignment system as "[u]tiliz[ing] a 'deceptive' and 'secret' process of allocating cases, in a manner which is inconsistent with [Local] Rule 3.4," D.E. 188 at 13, is also not supported by a reasonable inquiry into the facts. While Mr. Spolter could not have uncovered all of the details of the manner in which the District's case assignment system works prior to filing his recusal motions, a "reasonably competent attorney" in Mr. Spolter's place would have known enough to recognize that the District's case assignment program does not operate on a "100%" pure blind, random system. Consequently, a "reasonably competent attorney" would not have instructed an expert to conduct a study based on that incorrect assumption. By engaging in precisely that conduct, however, Mr. Spolter effectively designed the study to be useless. He compounded his error by basing his contentions that a reasonable person could believe that the District's case assignment system was "rigged" solely on the expert's conclusion that Mr. Spolter's cases were assigned to Judge Zloch in a manner statistically inconsistent with the operation of a system that Mr. Spolter should have known for a fact to be non existent in the Southern District of Florida. In short, the record in this case precludes a finding that a reasonable attorney in like circumstances to that of Mr. Spolter could believe that Plaintiffs' claims that a reasonable person could conclude that Judge Zloch manipulated the blind, random case assignment system in the Southern District of Florida were factually justified.

## 2. The Legal Contentions

 Whether a motion is legally justified constitutes a question of law. *See In re International Yacht and Tennis, Inc.,* 922 F.2d 659, 663 (11th Cir.1991) (citing *Donaldson v. Clark,* 819 F.2d 1551, 1556 (11th Cir.1987) (*en banc*)). For that reason, the Court begins with an examination of 28 U.S.C. § 455(a), the statute Mr. Spolter invoked in seeking recusal of Judge Zloch.[30] *See, e.g.,* D.E. 156–2 at 5. Section 455(a) provides simply, "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A review of Mr. Spolter's briefs regarding recusal reflects that he was certainly competent in articulating the purpose of the statute, as well as in finding and identifying the case law interpreting it. *See, e.g., id.* at 5–6. As Mr. Spolter identified,

The intent underlying § 455(a) is "to promote public confidence in the integrity of the judicial process" and "to promote confidence in the judiciary by

---

29. *See* www.flsd.uscourts.gov; *see also* S.D. Fla. IOP (revised Aug. 12, 2005) at 5 (Introduction) ("A current copy of these procedures is also available at the Court's web site (http://www.flsd.uscourts.gov/.")).

30. Mr. Spolter makes a number of objections to Judge Zloch's handling of the various pending recusal motions. *See, e.g.,* D.E. 188 and 189. This Report and Recommendation neither discusses nor opines on the legal sufficiency of any of these objections, as they have not been referred to me.

avoiding even the appearance of impropriety whenever possible." Moreover, in light of the intent of the statute, disqualification should be granted where a judge would harbor any doubt concerning whether disqualification is appropriate. Thus, disqualification under § 455(a) is possible where no actual partiality, bias or prejudice for or against a party exists.

D.E. 156–2 at 6 (quoting *U.S. v. South Florida Water Management Dist.,* 290 F.Supp.2d 1356, 1359 (S.D.Fla.2003) (J. Zloch) (internal citations omitted from D.E. 156–2)). Mr. Spolter further correctly noted the standard for determining whether a judge should recuse himself under Section 455(a): " 'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality.' " *Id.* (quoting *U.S. v. Torkington,* 874 F.2d 1441, 1446 (11th Cir. 1989); *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1524 (11th Cir.1988)); *see also U.S. v. Patti,* 337 F.3d 1317, 1321 (11th Cir.2003).

Where Mr. Spolter faltered, however, occurred in his application of the legal standard to the instant cases. As noted above, the legal standard for recusal under Section 455(a) incorporates an important factual inquiry—it anticipates that an objective, disinterested, lay observer shall be "fully informed of the facts underlying the grounds on which recusal was sought" before determining whether he or she had a significant doubt regarding the judge's impartiality. *See* 28 U.S.C. § 455(a). Indeed, the Eleventh Circuit has observed that in applying the legal standard for recusal under Section 455(a), " 'factual allegations need not be taken as true, and the test is whether 'a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.' ' " *Evergreen,* 570 F.3d at 1263 (quot-

ing *Glass v. Pfeffer,* 849 F.2d 1261, 1267 (10th Cir.1988) (quoting *Hinman v. Rogers,* 831 F.2d 937, 938 (10th Cir.1987))).

Here, for the reasons previously discussed, the Court cannot find that an objective, disinterested person who was fully informed of the facts to the extent that Mr. Spolter could and should have been at the time he filed the recusal motions would entertain a significant doubt about Judge Zloch's impartiality. As presented by Mr. Spolter at the evidentiary hearings, Mr. Spolter based the recusal motions solely on his interpretation of Local Rule 3.4, S.D. Fla., and Dr. Radulovic's study. A fully informed person, however, would have reviewed the IOP's and understood them in conjunction with Local Rule 3.4, S.D. Fla., to describe a case assignment system that accounts for location of origin, among other factors, in making assignments, and is not a *pure* blind, random system. In this respect, a person as fully informed as was possible based on the information made available to Mr. Spolter before he filed his recusal motions, would not have relied on Dr. Radulovic's study because it does not take into account the publicly available IOP's, which expressly state a preference for assigning cases to judges in the locations where the cases originated and thereby preclude the possibility that the District operates under a *pure* random, blind system. Dr. Radulovic's conclusions are applicable only to a pure, blind, random selection system—a system that a mere reading of the One Division Rule in the IOP's should have revealed does not exist in the Southern District of Florida. In Dr. Radulovic's own words, the preference for assigning cases to judges sitting in the cases' locations of origin "could make [a] tremendous difference" in the analysis. 6/24/09 Trans. at 112.

Nevertheless, based solely on Local Rule 3.4, S.D. Fla., and Dr. Radulovic's report, in these cases, Mr. Spolter assert-

ed that a "reasonable person" with publicly available information regarding the case assignment system in the Southern District of Florida would believe that (1) "the court clerk's computer was programmed to divert at least some employment law cases filed by an attorney to Judge Zloch, or the in-take clerk, as a result of having been so instructed, handpicked Judge Zloch to preside over the employment law case being handled by the clerk during the intake process[;]" (2) "Judge Zloch had intended to divert to himself employment discrimination lawsuits, regardless of which attorney filed them, for purposes of dismissing cases having a cause of action which he disfavors[;]" and (3) "Judge Zloch further engineered a scheme to divert to himself a number of [Mr. Spolter's] newly filed employment law cases" following Mr. Spolter's filing of papers with the Eleventh Circuit in *Bettis* and *Sabatier* seeking disqualification of Judge Zloch because of his alleged religious and political views.[31] Quite simply, nothing in the record supports the idea that Judge Zloch either manipulated or caused the manipulation of the District's case assignment system. As a result, the Court cannot find that "an objective, disinterested, lay observer fully informed of the facts underlying [Mr. Spolter's hypothesis that Judge Zloch had done so] would entertain a significant doubt" about Judge Zloch's impartiality, and Mr. Spolter's recusal motions are, consequently, not legally justified.

### 3. *Purpose in Filing Recusal Motions*

█ Finally, the Court reaches the question posed by Judge Zloch regarding whether Mr. Spolter presented the recusal motions at issue in these matters for an improper purpose. *See* D.E. 173 at 3. At the outset, the Court notes the motivation to which Mr. Spolter attributes his filing of the recusal motions:

> [Mr. Spolter] has—with only good intentions—sought to determine whether his concern that a disproportionate number of [Mr. Spolter's] cases did over a short period of time become directed to one specific judge.... [I]t is my legal obligation to diligently represent the interests of my clients, particularly when a university professor concludes from analysis within his field of expertise that what the Southern District of Florida purports to utilize a random, blind selection process to distribute cases to judges has yielded outcomes which make it nearly impossible that the process has operated in such a manner. To have failed to act upon the information uncovered by Dr. Radulovic's research, [Mr. Spolter] would have violated the Oath of Admission of the Florida Bar, which includes the following:
>
> > I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, nor any defense *except as I believe to be honestly debatable under the law of the land;*
> >
> > I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, *unless required by the justice of the cause which I am charged;*
> >
> > *I will never reject, from any consideration personal to myself, the cause of*

---

31. As Mr. Spolter knew at the time of filing the recusal motions, the Eleventh Circuit had already twice rejected Mr. Spolter's requests to disqualify Judge Zloch from *Bettis* and *Sabatier* on the basis of Judge Zloch's alleged religious and political views. *See Bettis*, D.E. 135 at 820; *Sabatier*, D.E. 59 at 1–2. Consequently, to the extent that Mr. Spolter intended his references to raising Judge Zloch's alleged religious and political views during the course of the proceedings in these cases to suggest a basis for why a reasonable person would "entertain a significant doubt" about Judge Zloch's impartiality, as a matter of law, they cannot suffice.

*the defenseless or oppressed,* or delay anyone's cause for lucre or malice. . . .

D.E. 188 at 9–11 (emphasis in D.E. 188).

While the Court understands and appreciates Mr. Spolter's explanation for his filings, the "improper purpose" inquiry is an objective one, and, consequently, even accepting Mr. Spolter's stated reasons for purposes of this discussion, Mr. Spolter's intentions cannot dictate the outcome concerning whether he filed the recusal motions for an "improper purpose." *See Stevens v. Lawyers Mut. Liab. Ins. Co. of North Carolina,* 789 F.2d 1056, 1060 (4th Cir.1986) (to determine "improper motive," "a court must judge the attorney's conduct under an objective standard of reasonableness rather than by assessing subjective intent"); *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986); *Sheets v. Yamaha Motors Corp., U.S.A.,* 891 F.2d 533, 538 (5th Cir.1990); *see also Evergreen,* 570 F.3d at 1272–80 (applying objective factors to assess "improper motive"). As one commentator has explained,

> In considering whether a paper was interposed for an improper purpose, the court need not delve into the attorney's subjective intent. The record in the case and all of the surrounding circumstances should afford an adequate basis for determining whether particular papers or proceedings caused delay that was unnecessary, whether they caused increase in the cost of litigation that was needless, or whether they lacked any apparent legitimate purpose. Findings on these points would suffice to support an inference of improper purpose. The court can make such findings guided by its experience in litigation, its knowledge of the standards of the bar of the court, and its familiarity with the case before it, and by reference to the criteria under the Federal Rules such as those in Rule 1 and Rule 26(b)(1).[ 32]

William W. Schwarzer, United States District Judge, N.D. Cal., *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 195–96 (1985).

Therefore, the Court turns to *Evergreen, supra,* to identify objective factors that the Eleventh Circuit has recently employed in assessing whether a litigant filed a document for an "improper purpose." *Evergreen,* like the instant litigation, involved a recusal motion. In *Evergreen,* the Eleventh Circuit upheld a district court's finding of "improper purpose/bad faith," [33] after reviewing (1) the substantive

---

**32.** Since Judge Schwarzer wrote this discussion regarding the standards in Rule 11, Rule 11 was amended to exclude application to discovery requests, responses, objections, and motions under Rules 26 through 37. *See* Fed. R.Civ.P. 11(d). The rest of Rule 11, as it pertains to a lawyer's certification that a paper is not being presented for any improper purpose remains effectively the same as it was at the time that Judge Schwarzer issued this piece. While Judge Zloch has not referred these matters to me for a determination regarding the appropriateness of sanctions under Rule 11, as previously discussed, the specific findings of fact he has directed me to make refer to terms and concepts encompassed in the certification requirements of Rule 11. Consequently, cases and other legal writing regarding these terms as they arise in the context of Rule 11 are applicable to the analysis here.

**33.** Although this Report and Recommendation does not purport to analyze whether Mr. Spolter acted in "bad faith" as that term is employed in jurisprudence regarding a court's inherent powers, in *Evergreen* the Eleventh Circuit's discussion of "improper purpose" appears in a section of the decision entitled, "Improper Purpose/Bad Faith." Following the heading, however, the analysis employs only the term "bad faith" in its discussion, concluding by finding that the recusal motion filer's "unfounded allegations and improper motive support a finding of bad faith." *Id.* at 1278–80. A review of the seven pages of analysis appearing between the heading and the conclusion reveals that the term "improper purpose" does not appear

content of the recusal motion, (2) the pursuit of the recusal motion, and (3) the attitude of counsel towards the court throughout the proceedings. Within each of the general categories, the Eleventh Circuit took into account particular factors.

In considering the substantive content of the recusal motion, the court considered the *Evergreen* recusal motion filer's "pursuit of a claim without reasonable inquiry into the underlying facts." *Id.* at 1274. Along the same lines, the court found telling the lawyer's ignoring of material facts, as well as his failure to provide to the expert on whom he relied in the recusal motion all material information necessary to develop a relevant expert opinion. *Id.* at 1275–76. Besides these indicators, the court looked to the attorney's use of the recusal motion to dispute "disagreeable adverse rulings" and seek revocation of prior orders without presenting evidence that the circumstances were extraordinary and required *vacatur.* *Id.* at 1274–75. Finding all of these circumstances to exist, the court determined that these facts supported a conclusion of improper purpose and bad faith.

As for specific factors identified by the Eleventh Circuit regarding the filer's pursuit of the recusal motion, the court referred to the timing of the filing of the recusal motion, *id.* at 1272–74, as well as the *Evergreen* recusal motion filer's continual stalling of the recusal proceedings. *Id.* at 1275. Other indications that the court considered included the filer's failure to reevaluate the basis for the recusal motion following an evidentiary hearing where the evidence did not sustain the theory for the recusal motion, *id.* at 1275–77, his "very public[ ]" pursuit of the recusal, *id.* at 1277, and his "dogged pursuit of [the trial judge's] testimony." *Id.* at 1279. The Eleventh Circuit also described the filer's efforts to obtain recusal as a "particularly egregious … pursuit of a claim without reasonable inquiry into the underlying facts." *Id.* at 1274.

With respect to the *Evergreen* recusal motion filer's attitude towards the court throughout the proceedings, the Eleventh Circuit took issue with the tone of the recusal motion. *Id.* at 1272–74. It further expressed concern that the filer had been "extremely difficult [for the court] to deal with and disrespectful to the court." *Id.* at 1277.

### a. Substantive Content of the Recusal Motions

Applying the *Evergreen* considerations here, the Court begins by reviewing the

once, but the court repeatedly uses the term "bad faith" in its discussion. Thus, it is clear that the Eleventh Circuit relied on the term "bad faith" as a kind of shorthand for referring to both "improper purpose" and "bad faith" when it conducted its "Improper Purpose/Bad Faith" analysis. Moreover, the *Evergreen* recusal motion filer averred that he brought the motion for a "proper purpose," *id.* at 1273, and that he believed "he had an ethical obligation to see this through," *id.* at 1276, and the decision contains no direct evidence of the filer's subjective intent of an improper purpose or that he filed in bad faith. Thus, in finding that the filer had an "improper purpose" and proceeded in "bad faith," the Court looked to objectively determinable factors. As the Court can discern no basis for

finding that any of these objectively determinable factors lack relevance in the context of objectively evaluating improper purpose, the Court interprets the Eleventh Circuit's references in *Evergreen* to "bad faith" to apply with equal force to "improper purpose." Moreover, to the extent that the *Evergreen* analysis can be viewed as somehow distinguishing between factors applicable to "improper purpose" and "bad faith," while not all improper purposes constitute bad faith, "bad faith" subsumes "improper purpose," in that a filing in bad faith will always constitute a filing made for an improper purpose. Consequently, consideration of the factors identified by the Eleventh Circuit for analyzing "bad faith," at worst, sets a higher threshold for "improper purpose."

substantive content of the recusal motions. In this regard, the Court finds compelling parallels to *Evergreen*. First, this Report and Recommendation already reviews the significant evidentiary deficiencies undermining the stated basis for the recusal motions—that a reasonable person could believe that Judge Zloch had caused to be diverted to himself employment and labor cases, or cases filed by Mr. Spolter. Among the problems contributing to the lack of evidentiary basis is the fact that Mr. Spolter apparently ignored the March 6, 2009, letter he received from Mr. Larimore, as well as the IOP's applying to the case assignment system, both of which contained information material to Mr. Spolter's recusal motion. As a result, Mr. Spolter did not provide the IOP's to his expert, Dr. Radulovic, and he affirmatively instructed Dr. Radulovic to make the wrong assumptions in conducting his study, thereby rendering Dr. Radulovic's report useless for purposes of determining whether that any manipulation of the District's case assignment system occurred.

With respect to the relief Mr. Spolter sought in the recusal motions, the Court reviews each motion separately. In *Bettis*, Mr. Spolter filed the recusal motion as part of Ms. Bettis's Motion for Reconsideration of Order Granting Summary Judgment and Judgment [D.E. 156]. As stated in that motion, Mr. Spolter sought through his request for recusal for the Court, under Rule 60(b)(6), Fed.R.Civ.P., to set aside Judge Zloch's rulings approving Judge Snow's Report and Recommendation recommending the granting of Toys "R" Us's Motion for Summary Judgment and granting Toys "R" Us's Motion for Summary Judgment [D.E. 153], as well as the Final Judgment for Toys "R" Us [D.E. 154]. *See* D.E. 156 at 1; 156–2 at 5–18.

Likewise, in *Sabatier*, Mr. Spolter filed the recusal motion as part of Mr. Sabatier's Motion for Fed.R.Civ.P. 60(b)(6) Relief [and] Disqualification [*Sabatier*, D.E. 81]. As in *Bettis*, the relief Mr. Spolter requested through this motion included setting aside, pursuant to Rule 60(b)(6), Fed. R.Civ.P., the Final Judgment and its denial of all pending motions, including Mr. Sabatier's Motion to Reopen Discovery to Permit Taking of Deposition of Former Direct Supervisor [*Sabatier*, D.E. 70], Judge Zloch's Order granting SunTrust's Motion for Reconsideration and SunTrust's Motion for Summary Judgment [*Sabatier*, D.E. 69], and Judge Zloch's Order denying Mr. Sabatier's Motion for Recusal entered nearly two years earlier, on July 17, 2007 [*Sabatier*, D.E. 61]. *Sabatier*, D.E. 81 at 1, 3–16.

*Gossard* follows a similar pattern. There, Mr. Spolter filed his recusal motion as part of Ms. Gossard's Motion for Reconsideration of Order Granting Summary Judgment and Judgment [*Gossard* D.E. 71]. In this Motion, Mr. Spolter sought for Judge Zloch, once again under Rule 60(b)(6), Fed.R.Civ.P., vacate his Order granting summary judgment to JP Morgan Chase & Co. [D.E. 59], as well as the Final Judgment [D.E. 60]. *Gossard* D.E. 71 at 1, 14–18.

Only the recusal motion filed in *Paul* [*Paul*, D.E. 3] does not seek *vacatur* of any prior order entered by Judge Zloch, as it was filed prior to serving D & B Tile with the lawsuit. *See, generally, Paul* docket sheet. As the Eleventh Circuit has noted, "[A] recusal motion is an improper vehicle to dispute disagreeable adverse rulings. It is a clear abuse of such a pleading." *Evergreen, supra*, at 1274. Rather, "[c]hallenges to adverse rulings are generally grounds for appeal, not recusal." *Id.*

### b. *Pursuit of the Recusal Motions*

This last point brings the Court to Mr. Spolter's pursuit of the recusal motions at issue. Significantly, Mr. Spolter filed the

*Sabatier* recusal motion seeking for the Court to vacate its Final Judgment and its denial of all pending motions, including Mr. Sabatier's Motion to Reopen Discovery to Permit Taking of Deposition of Former Direct Supervisor [*Sabatier*, D.E. 70], Judge Zloch's Order granting SunTrust's Motion for Reconsideration and SunTrust's Motion for Summary Judgment [*Sabatier*, D.E. 69], and Judge Zloch's July 17, 2007, Order denying Mr. Sabatier's Motion for Recusal [*Sabatier*, D.E. 61], on June 8, 2009—five months after the Eleventh Circuit had entered its mandate upholding these exact same rulings. *See Sabatier*, D.E. 80. Thus, not only was the litigation well over at the time that Mr. Spolter filed the recusal motion (not to mention the fact that nearly two years had passed since Judge Zloch's ruling on the July 17, 2007, recusal motion challenged by the recusal motion pending now), but also the appropriate method for challenging adverse rulings—an appeal—had already occurred, and Mr. Spolter had lost.

Moreover, in both *Bettis* and *Sabatier*, Mr. Spolter asked the Eleventh Circuit to disqualify Judge Zloch based on many of the allegations he continues to raise in the recusal motions at hand, even though the Eleventh Circuit had already rejected these very same contentions as a basis for disqualification in both *Bettis* and *Sabatier*. More specifically, in both the *Bettis* and *Sabatier* appeals, Mr. Spolter asserted that Judge Zloch's alleged connections to Ave Maria Law School, his purported financial support of that school, his hiring of law clerks who graduated from Ave Maria, and his alleged participation in organizations such as the Federalist Society created the appearance of bias against employment and labor plaintiffs. *See* D.E. 135 at 819–20; *Sabatier*, D.E. 80 at 915, *Sabatier*, D.E. 59 at 1–2. In *Sabatier*, for example, Mr. Spolter alleged in his 2007 recusal motion before the district court, the denial

of which was upheld by the Eleventh Circuit in a mandate issued in January, 2009,

> Last year, Judge Zloch simultaneously employed two legal clerks who were graduates of Ave Maria, the controversial law school, according to the U.S. District Court website.... In that Ave Maria law School's website listing of Judicial Clerkships held by its graduates indicates Judge Zloch has employed three of their former students, this third student was employed by Judge Zloch prior to this past year.

> It[']s quite unique for a federal judge to simultaneously employ two legal clerks from an obscure law school which has just recently gained American Bar Association Accreditation and lacks such accreditation by the American Association of Law Schools, especially one so recently established. Typically, federal judges are able to draw upon the best and brightest law students, from top "national" law schools such as Harvard, Yale, the University of Michigan, and the University of Texas, as well as from highly regarded regional schools such as [t]he University of Florida, [t]he University of Miami, Duke, Catholic University, Georgetown University, Vanderbilt, Notre Dame and/or a number of other "established" law schools.

*Sabatier*, D.E. 59 at 15–16. The motion continues, discussing Ave Maria School of Law and Judge Zloch's purported support of the school in more detail. *See id.* Similarly, the Eleventh Circuit's decision in *Bettis* reports, "Specifically, Bettis argues that the judge's hiring of several law clerks from Av[e] Maria Law School [and] his financial support of that school ... establish bias." D.E. 135 at 819 n. 8.

The Eleventh Circuit soundly rejected this basis for recusal:

> Here, [where Ms. Bettis failed to seek recusal of the district court judge in the

proceedings below,] there was no plain error in the judge's failure to *sua sponte* recuse. Bettis has established no bias—or even an appearance of bias. Moreover, a review of the record establishes that the court was even-handed in resolving the motions before it.

\* \* \* \* \*

[W]e conclude reassignment is unnecessary. Notably, the facts Bettis relies upon to argue an appearance of impropriety were not before the district court. Rather, it seems that she is attempting to create an appearance of impropriety to further her request for recusal and reassignment. There is no appearance of impropriety....

D.E. 135 at 820. Not only did the Eleventh Circuit conclude that no impropriety or appearance of impropriety existed sufficient to require Judge Zloch *sua sponte* to recuse himself in the absence of the filing of a recusal motion, but in *Sabatier*, where Mr. Sabatier appealed Judge Zloch's denial of his recusal motion, the Eleventh Circuit reached the same conclusion, seeing "no abuse of discretion in [Judge Zloch's] decision to deny Sabatier's motion to recuse." *Sabatier*, D.E. 80 at 915. Moreover, returning to *Bettis*, the Eleventh Circuit cautioned, "[I]t seems that [Ms. Bettis] is attempting to create an appearance of impropriety to further her request for recusal and reassignment." D.E. 135 at 820.

Despite the Eleventh Circuit's unambiguous elimination of Judge Zloch's alleged religious and political bents as a basis for recusal and the Eleventh Circuit's feeling that raising such grounds appeared to constitute an attempt to create an appearance of impropriety to further a recusal request, which, the Eleventh Circuit implied would be improper, Mr. Spolter supported the pending recusal motions in part by again invoking Judge Zloch's alleged ties to Ave Maria Law School and his political views. *See, e.g.*, D.E. 156–2 at 14–16. Although

he phrased it slightly differently from his arguments in the *Bettis* and *Sabatier* appeals, the ideas remained the same:

Not an institution well known to the general public, Ave Maria School of Law, is a controversial faith-based legal program. Its website emphasizes having Catholic roots and teaching law from the perspective of traditional Catholic moral teaching. Ave Maria's website also stresses teachings incorporating the "integration" of religion and law. Professors' lectures "might reference Catholic teaching" and an employment law course "would likely allocate time to a presentation and discussion of relevant encyclicals and the Catechism." ...
Though one of 200 law schools within the U.S. accredited by the American Bar Association, Ave Maria School of Law is not among the 171 legal programs accredited by the American Association of Law Schools....

In [Mr. Spolter's] unsuccessful effort to have Judge Zloch recuse himself while the *Sabatier* case was still in the trial court and also as explained in [Mr. Spolter's] appellate brief in [*Bettis*], to be hired as a clerk by a Federal court judge is both an honor and quite prestigious. Federal judges enjoy the "pick of the crop," often favoring students hailing from Harvard, Yale, Stanford, the University of Chicago, [t]he University of Texas, and other top nationally known schools, as well as from strong regional schools such as [t]he University of Florida, the University of Miami, Duke and Vanderbilt. Combined with the factual information stated earlier, a reasonable person can believe that Judge Zloch has a political and religious bias against plaintiffs in employment law cases, which motivated him to staff his chambers with like-minded "zealots" as Clerks and these same far from "mainstream" beliefs motivated Judge Zloch

to subvert the random/blind process by which trial court judges are to be assigned to newly filed trial court level cases....

*Id.* at 15–16. This continued insistence on invoking Judge Zloch's alleged religious and political views in support of seeking recusal, after being told by the Eleventh Circuit twice that such grounds were insufficient, is troubling.

Adding to the problem is the nature of the allegations contained within the recusal motions presently before the Court. Mr. Spolter suggested that a reasonable person could believe that Judge Zloch caused the case assignment system to be "rigged" so that he could dismiss employment and labor actions, as well as those cases filed by Mr. Spolter—a shocking and outrageous situation if it were true. *See, e.g.,* D.E. 156–2 at 7–11. Indeed, Mr. Spolter asserted that as a result of Judge Zloch's alleged perceived actions,

> The risk of undermining the public's confidence in the judicial process with the realization that a district court judge, while also holding the position of Chief Local Judge, arranged for himself to be assigned to [Mr. Spolter's] cases or the appearance that he did in violation of the Court's own rule is great.

*Id.* at 17. In a bow to the incredible nature of Mr. Spolter's contentions, an article repeating the allegations appeared in the *Daily Business Journal.* *See* D.E. 191–2. Moreover, the article suggests that Mr. Spolter encouraged publication of his recusal motion assertions, with Mr. Spolter quoted as saying, "This reopens everything in my opinion.... My clients filed their lawsuits for justice but feel they wound up

with someone's agenda instead.... [Judge Zloch's] close affiliation with [Ave Maria] is a tell-tale sign of his partiality." [34] *Id.* at 2–3.

Turning to the evidentiary hearings in this matter, the Court must consider Mr. Spolter's attempts to procure the testimony at the hearing of Judge Zloch. Mr. Spolter originally advised the Court on June 22, 2009, of his intention to call Judge Zloch as a witness when the various Plaintiffs filed their witness lists for the hearing. *See* D.E. 184. The Court issued an Order that same day striking Judge Zloch as a witness. *See* D.E. 185. In the Order, the Court cited *Evergreen* and explained that under binding Eleventh Circuit precedent, requiring the presiding judge to testify at a hearing for which he will make findings of fact violates Rule 605, Fed. R.Evid. Moreover, the Court reasoned, Mr. Spolter could obtain the evidence he needed from the Clerk of Court.

The following day, Mr. Spolter sought reconsideration of the decision. *See* D.E. 191. The Court granted the motion for reconsideration but again denied Mr. Spolter's request to require Judge Zloch to testify at the hearing. *See* D.E. 193. As in the original Order striking Judge Zloch from the witness list, the Order reconsidering Mr. Spolter's request to call Judge Zloch cited *Evergreen* and explained the legal basis for the ruling. The following day, June 24, 2009, Mr. Spolter began his remarks at the evidentiary hearing by again raising the Court's decision to strike Judge Zloch from the witness list. *See* 6/24/09 Trans. at 5. If not "dogged pursuit of [the trial judge's] testimony," *Evergreen* at 1279, Mr. Spolter's efforts to require

---

**34.** In addition to demonstrating Mr. Spolter's public pursuit of Judge Zloch's recusal, this statement attributed to Mr. Spolter once again invokes Judge Zloch's alleged religious views as a basis for recusal, even though the Eleventh Circuit had already twice found such contentions to be insufficient even to create the appearance of impropriety and had warned Mr. Spolter that his raising of the issue seemed to constitute an attempt to create an appearance of impropriety to support the recusal request.

Judge Zloch to testify are certainly significant.

As for the remaining considerations under pursuit of the recusal motion, the Court looks first to whether Mr. Spolter continually stalled the recusal proceedings. In reviewing the record, the Court finds that Mr. Spolter did make numerous objections to the evidentiary hearing, describing it as "improper," *see id.*, even though it appeared from his recusal motions that he suggested a public airing of his allegations concerning the alleged "rigging" of the Court's case assignment system. *See* D.E. 156-2 at 8 (" 'The suggestion that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow .... ***Such charges, to the extent they are being raised, must not remain unexamined and unanswered.***' ") *Id.* (emphasis added) (quoting *Cruz v. Abbate*, 812 F.2d 571, 573–74 (9th Cir.1987)). *See* D.E. 177, 188, 6/24/09 Trans. at 4–7. Nevertheless, he sought only a single continuance of the evidentiary hearing, and the length of the continuance requested was not unreasonable. Therefore, taking into account all of the relevant facts, the Court does not find that Mr. Spolter stalled the recusal proceedings.

With regard to re-evaluating the basis for the recusal motions following the June 24, 2009, evidentiary hearing where the Court announced that it found no evidence to support the suggestion of manipulation of the case assignment system, the Court notes that while at the July 2, 2009, hearing Mr. Spolter did not disavow the suggestion that a reasonable person could believe that Judge Zloch had caused employment or labor cases, or matters filed by Mr. Spolter, to be diverted to himself, to his credit, Mr. Spolter did not continue to urge this contention at the July 2, 2009, either. *See* 7/2/09 Trans. at 15–17.

He did, however, again assert that at the time that he filed the recusal motions, a reasonable person could have believed that Judge Zloch had manipulated the case assignment system. *See id.* The problem with this position stems from the fact that it does not recognize that the factual inquiry conducted by Mr. Spolter prior to filing the recusal motions did not suffice because it ignored the IOP's and depended on a study that, by its design, was inapplicable to the allegations made by Mr. Spolter. These actions by Mr. Spolter, while deficient, do not rise to the level of those taken by the attorney in *Evergreen.*

Nevertheless, in view of the other factors for consideration under the inquiry into the pursuit of recusal, the facts in this case require a finding that Mr. Spolter's activities in these cases constituted a "particularly egregious ... pursuit of a claim without reasonable inquiry into the underlying facts...." *Evergreen* at 1274. Mr. Spolter filed the recusal motions after ignoring Mr. Larimore's reference to the IOP's and Eleventh Circuit decisions in two of the cases at issue, upholding, in the case of *Sabatier*, the orders sought by Mr. Spolter to be vacated through the pending recusal motions, and in both *Bettis* and *Sabatier*, expressly denying one of the very bases for recusal Mr. Spolter continued to allege in the pending motions—more specifically, Judge Zloch's alleged religious and political views. Moreover, the Eleventh Circuit *Bettis* decision cautioned Mr. Spolter that it seemed as though he was attempting to create an appearance of impropriety to further his recusal motion, an action that, if true, would be improper. In addition, the nature of the allegations made in the pending recusal motions was so shocking—going to the core of the integrity of both Judge Zloch and the Southern District of Florida's case assignment system—that it was, at best, irresponsible

not to conduct as thorough an investigation as possible prior to making such contentions. And Mr. Spolter's decision to encourage the publication of his allegations and the design-flawed study he claimed supported them makes the deficiencies even more glaring, particularly against the background of Mr. Spolter's repeated efforts to obtain the testimony of Judge Zloch. In short, the Court finds that, in itself, Mr. Spolter's pursuit of recusal demands a finding of improper purpose.

### c. Attitude Towards the Court

Finally, the Court considers Mr. Spolter's attitude towards the Court. In so doing, I note first that, setting aside the content of Mr. Spolter's recusal motions, Mr. Spolter's tone and conduct at the evidentiary hearings was professional. He treated the witnesses, opposing counsel, and the hearing Court with respect.

Unfortunately, however, the same cannot be said of the record regarding Mr. Spolter's activities in front of Judge Zloch. While the Court recognizes there may be no easy way for an attorney to suggest to a judge that he should recuse himself, certain statements simply show a lack of respect. Among others statements falling into this category, for example, Mr. Spolter wrote the following in the recusal motions:

> This same reasonable person could objectively come to believe that Judge Zloch had intended to divert to himself employment discrimination lawsuits, regardless of which attorney filed them, for purposes of dismissing cases having a cause of action which he disfavors, and after [Mr. Spolter] through motions based on thoroughly documented research revealed Judge Zloch's non-mainstream political and religious beliefs which led to unfair and improper bias displayed in numerous rulings in numerous cases, Judge Zloch further engineered a scheme to divert to himself a

> number of [Mr. Spolter's] newly filed employment law cases. That Judge Zloch was Chief Judge through June 30, 2007, and was situated inside the same courthouse where [Mr. Spolter] filed these lawsuits, could well permit the reasonable person to objectively conclude this jurist had: 1) motive; 2) opportunity; and, 3) means to divert at least some of [Mr. Spolter's] cases out of the "general pool" and to himself. This same reasonable person can also come to hold the conviction that Judge Zloch intentionally avoided diverting all 15 cases filed by [Mr. Spolter] to himself, by instead diverting instead "just" many of them (one-third, in actuality), should someone uncover the actions which have been described in this pleading.

D.E. 156–2 at 11–12. These are serious allegations. Yet, as previously discussed, they are unsupported by any evidence. The fact that Mr. Spolter made such allegations without first having researched them as thoroughly as was possible for him to do and that he then publicized his accusations is, in itself, disrespectful and creates an appearance that Mr. Spolter may have been attempting to embarrass Judge Zloch. Indeed, Mr. Spolter's commentary on Judge Zloch's prior rulings is especially troubling. At the time that Mr. Spolter claimed that Judge Zloch displayed "unfair and improper bias ... in numerous rulings in numerous cases" as a result of Judge Zloch's alleged "non-mainstream political and religious beliefs," Mr. Spolter knew that the Eleventh Circuit had already (1) affirmed the *Sabatier* rulings about which Mr. Spolter complained; (2) twice rejected Mr. Spolter's recusal requests that were based on the very theory invoked again by Mr. Spolter in this portion of the pending recusal motions; and (3) expressly described Judge Zloch in *Bettis* as "even-handed in resolving the motions before it." To continue to press

arguments that a judge has ruled against a litigant for reasons of bias, particularly in the face of *two* appellate court decisions reaching precisely the opposite conclusion, disrupts the litigation and makes it "extremely difficult [for the court] to deal with." *See Evergreen* at 1277.

Nor did the challenges presented by Mr. Spolter begin and end with the filing of the recusal motions at issue. Indeed, in *Bettis,* the Eleventh Circuit described Mr. Spolter's conduct in the district court until that point in those proceedings as "uncooperative," pointing out that Mr. Spolter had "failed to correspond with defense counsel or to respond to defense counsel's communications, and failed to comply with the court's orders. In addition, during depositions, [Mr. Spolter] repeatedly instructed Bettis not to answer questions, interrupted defense counsel, and coached the witness." D.E. 135 at 816 n. 1.

Similarly, in the first recusal motion filed in *Sabatier,* Mr. Spolter was even more direct in his reflecting his dislike and disrespect of the Court. Among other inappropriate comments, Mr. Spolter wrote regarding the Court's imposition of a deadline for filing a brief,

> The Court's requirement that a response brief involving the highly technical issue of bankruptcy, to be filed by [Mr. Spolter] (an attorney who is not admitted to practice in the U.S. Bankruptcy Court) and requiring a response be filed at the highly unusual hour of mid-day, just two business days after issuance of such an order, could not have been motivated for any logical, rational or permissible reason. Instead, the painfully short deadline for the filing of a response was a calculated effort driven by the trial judge's inextricably intertwined and extreme religious and political agenda to find any means of disposing of the *Bettis*

case.... Realizing that the Plaintiff's response to the Defendant's Motion for Summary Judgment in *Bettis* was unusually strong and convincing—on so many points and with evidence so overwhelming—Judge Zloch created a pretextual, non-legitimate excuse to derail the *Bettis* matter from proceeding to trial.... The substantiation is so complete, and the one-sidedness of the numerous judicial rulings in the *Bettis* case is so extreme, there can be no doubt, sadly, that the trial Court exhibited an on-going pattern of systematic, impermissible bias against *Bettis,* due to the woman's intentions to return to work shortly after giving birth to her child, as opposed to being a "stay at home" mother for purposes of raising her child in the "traditional" sense. Judge Zloch prefers ... women stay home to raise their children, as opposed to returning to work after giving birth, as has become evident by Judge Zloch's financial contributions, hiring practices and affiliations with political/religious organizations maintaining extreme views.

*Sabatier,* D.E. 59 at 5–6.[35] Although a lawyer should be lauded for having the courage to take a stand against any truly biased activity on the part of a court, Mr. Spolter's actions do not fall into that category. Rather, these statements exceed the bounds of properly raising grounds for recusal or disqualification and instead constitute personal attacks on the presiding judge. As a result, particularly when considered in conjunction with the inquiries into the contents and pursuit of the recusal motions, they demand a finding of improper purpose.

## IV. CONCLUSION

The parties shall have ten (10) days from the date of being served with a copy

---

**35.** Despite the inflammatory allegations, as previously noted, the Eleventh Circuit reject-

ed all of these suggestions. *See Bettis,* D.E. 135.

**1342**

of this Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the district judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993); *Lo-Conte v. Dugger,* 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (*en banc* ); [36] 28 U.S.C. § 636(b)(1).

July 10, 2009.

---

**36.** Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.,* 667 F.2d 33, 34 (11th Cir.1982).